BURKE, Judge.
The appellant, Timothy Scott Boyle, was convicted of murdering two-year-old Savannah White, an offense defined as capital by § 13A-5-40(a)(15), Ala.Code 1975, because the victim was under the age of 14 at the time of her death, and for possessing a controlled substance, a violation of § 13A-12-212(a)(l), Ala.Code 1975. The jury unanimously recommended that Boyle be sentenced to death on the capital-murder conviction. The circuit court followed the jury’s recommendation and sentenced Boyle to death on his capital-murder conviction and to 10 years’ imprisonment on his possession conviction. This appeal followed.
The State’s evidence tended to show that on October 26, 2005, at around 6:30 a.m. Boyle brought Savannah to the emergency room of the Riverview Regional Medical Center. .She was nonresponsive, had bruises on her forehead, had what appeared to be a cigarette burn- on her foot, and had red marks around the front of her neck. Dr. James Lauridson, the forensic pathologist who conducted the autopsy on Savannah, testified that Savannah died as a result of cerebral edema, or brain swelling, from blunt-force trauma to her head, that Savannah’s head injuries spanned the entire circumference of her head and that her brain swelled to such a degree that part of it broke off and pushed down into her spinal cord.
H.D.,[1] the nine-year-old sister of the victim, testified that she was five years old at the time of Savannah’s death. About a week before Savannah’s death, H.D. said, Boyle hit Savannah’s head against the ear *184 door when he was putting her in her car seat because he was mad at Savannah. On the night before Savannah’s death H.D. was taking a bath and Boyle came in the bathroom, threw her against the wall, and told her to leave.[2] She peeked through the door, H.D. said, and saw Boyle throw Savannah against the wall in the bathtub and dunk her head under the water several times. That night, H.D. said, Savannah cried for a long time and threw up all over the bed that H.D. and Savannah shared. H.D. testified that Boyle would not leave Savannah alone and that he came into their room throughout the night and told Savannah to go to sleep and when she would not he would slap her. The next morning, H.D. said, she was unable to wake Savannah. H.D. further testified that she never saw anyone but Boyle hit Savannah in the head. (R. 1384.)
Kim Parr testified that at the time of Savannah’s death she lived next to the victim and her mother, Melissa White, at Rainbow Apartments in Rainbow City. She said that before White met Boyle, about three months before Savannah’s death, White was a good mother but that that changed after Boyle came into her life. Parr said that when Boyle was around, Savannah would scream and that on October 20, 2005, when she was babysitting, she noticed what appeared to be a cigarette burn on Savannah’s foot and bruises on her forehead. She asked Boyle how Savannah had been burned, Parr said, and he told her that he was holding Savannah and smoking a cigarette and that he accidentally burned her ankle when Savannah turned her head. Parr photographed Savannah’s injuries and reported the injuries to the Department of Human Resources (“DHR”) a few days before Savannah’s death. Parr said that she saw Savannah at around 9:00 p.m. on the night before her death and that she had a runny nose but otherwise seemed fine and did not appear to be injured. Parr further testified that early in the morning of October 26, 2005, Boyle telephoned her four times from the emergency room and asked her to remove drugs from the apartment — she declined to do so. The last time he telephoned, Parr said, Boyle was laughing because he told her the police were chasing him around the hospital. Parr testified that Boyle told her that he wanted her to remove the pills because he knew that DHR would investigate and he thought that White might lose her children.
Francina Lemons, a nurse at Riverview emergency room, testified that in the early morning hours of October 26, 2005, she observed Boyle outside the emergency room holding Savannah and pacing in front of the door. She said that she and a coworker, Emily Millican, brought them into the emergency room. Lemons said that Savannah had red marks around the front of her neck, bruises on her forehead, and what appeared to be a cigarette burn on one of her feet. Lemons gave three accounts of what Boyle said about Savannah’s injuries: First, Lemons said, Boyle told her that he could not get Savannah to wake up and he may have given her too much Tylenol brand pain reliever; second, Boyle said that he found Savannah hanging over her bed with a sheet wrapped around her neck and he had tried to revive her; and third, she overhead Boyle on the telephone saying that Savannah would not stop crying and he could not get her quiet.
Claude Burk, Savannah’s maternal grandfather, testified that he and his wife frequently took care of Savannah and her *185 sister on the weekends and that around a week before Savannah’s death he noticed knots on the back of Savannah’s head and a burn on her left foot. Burk said that he and his wife confronted Boyle about Savannah’s injuries and he told them that he had accidentally hit Savannah’s head on the roof of the car when he was putting her in her car seat and that he accidentally burned her foot with a cigarette when he was holding her and she turned.
Cathy Horton, a nurse at Riverview emergency room, testified that Savannah was not responsive when she was admitted, that she had marks on her hands and feet, that she had a bruise on her forehead, and that blood tests showed the presence of amphetamine in her system.
Sgt. Charles Clifton, with the Cherokee County Sheriffs office, testified that he searched the victim’s residence after hospital personnel reported Savannah’s injuries. He seized the sheets on Savannah’s bed, he said, because they were stained with vomit. Sgt. Clifton also testified that he had been informed that Boyle had contacted a neighbor and asked her to remove some pills from the master bedroom, and as a result he seized various pills and a crack pipe from the apartment. Two pills were identified as oxycodone hydrochloride, a Schedule II controlled substance; 4 pills were identified as Clonazepam, a Schedule IV controlled substance; and 25 pills were identified as methylphenidate hydrochloride, a Schedule II controlled substance.
In his defense, Boyle presented the testimony of his cousin, Victoria Miller, who testified that she had been around Boyle and Savannah and that Savannah did not act like she was scared of Boyle. She also said that Boyle had been active in planning Savannah’s birthday party just a few days before her death.
Steven Johnson, an Etowah County DHR caseworker, also testified for Boyle. Johnson said that he spoke with H.D. at the hospital immediately after Savannah was brought to the emergency room and that H.D. told him that Boyle threw Savannah in the bathtub and that he drowned her but she did not mention that Boyle had burned Savannah with a cigarette or that Boyle had slapped Savannah.
The jury convicted Boyle of murdering two-year-old Savannah. A separate sentencing hearing was held at which time the jury unanimously recommended that Boyle be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Boyle to death. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-53, Ala.Code 1975.

Standard of Review

Because Boyle has been sentenced to death, this Court must search the record of the trial proceedings for plain error. See Rule 45A, Ala. R.App. P. Rule 45A, states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
In defining the scope of “plain error,” this Court in Hall v. State, 820 So.2d 113 (Ala.Crim.App.1999), stated:
“Plain error is defined as error that has ‘adversely affected the substantial right of the appellant.’ The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or *186 on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See Ex parte Price, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr. App.1997), aff'd, 723 So.2d 770 . (Ala. 1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
820 So.2d at 121-22.
Boyle was convicted of both capital murder and the noncapital offense of possession of a controlled substance. The plain error standard of review does not apply to noncapital convictions. In Ex parte Woodall, 730 So.2d 652 (Ala.1998), the Alabama Supreme Court held that a defendant who is convicted of both a capital offense and a noncapital offense, in the same proceeding, should not be entitled to benefit from the plain-error rule in regard to the noncapital conviction. The Supreme Court stated:
“Because the defendant in this case was sentenced to death, we have complied with our obligation [to conduct] a plain-error review. However, with respect to his attempted murder conviction, for which he received a sentence of less than death, we do not believe the defendant is entitled to benefit from our plain error review. We have found no Alabama decision dealing with the particular situation present here: a case in which plain error necessitated a reversal on a capital conviction and death sentence but in which the defendant was also sentenced to a term of imprisonment on another conviction. However, the defendant’s sentence of imprisonment for his conviction of attempted murder does not implicate the same heightened degree of concern for reliability that attended his sentence of death for the capital conviction. It is well established that where á defendant receives only a prison sentence the plain-error doctrine is not applicable and an appellate court will not consider an alleged error that the defendant failed to preserve by making a proper and timely objection in the trial court. See Biddie v. State, 516 So.2d 846 (Ala.1987); Harris v. State, 347 So.2d 1363 (Ala.Cr.App. 1977), cert. denied, 347 So.2d 1368 (Ala. 1978 [1977]). Indeed, it has been said that the plain-error doctrine ‘applies to death penalty cases, but not to other convictions’ Pwgh v. State, 355 So.2d 386, 389 (Ala.Cr.App.), cert. denied, 355 So.2d 392 (Ala.1977) (citations omitted) (emphasis added).
“Had the defendant been convicted and sentenced to a term of imprisonment on the attempted murder count but either acquitted or sentenced to life imprisonment without the possibility of parole on the capital murder count, the plain-error doctrine would not have applied. Thus, we would not have even considered the error upon which we have predicated our reversal of his capital conviction and death sentence: the State’s questioning of the defendant regarding his character and the subsequent introduction of evidence of specific incidents tending to indicate a propensity for violence. No objection to that questioning was raised at trial. The defendant should not be put in a more favorable position with respect to our *187 review of his noncapital conviction simply because he was also found guilty of a capital offense and was sentenced to death. Thus, we conclude that the defendant’s failure to object to the State’s inquiry into his character or to the introduction of evidence of the three violent incidents precludes this Court from considering those grounds as the foundation for a reversal of his attempted-murder conviction, for which he received a sentence of less than death.”
730 So.2d at 665. Thus, according to Woodall, before this Court may review any claims related to Boyle’s conviction for possession of a controlled substance, those issues must have been properly objected to at trial and preserved for this Court’s review on appeal. Boyle is not entitled to the heightened standard of review in Rule 45A, Ala. R.App. P., in relation to his conviction for possession of a controlled substance.
With these principles in mind, we review the claims raised by Boyle in his brief to this Court.

Guilt-Phase Issues

I.
Boyle argues that the circuit court erred in allowing the capital-murder charge and the possession-of-a-controlled-substance charge to be joined in a single indictment. Specifically, he asserts that according to the Supreme Court’s decision in Ex parte Tisdale, 990 So.2d 280 (Ala. 2007), the offenses were separate and unrelated and it was reversible error to join the offenses.
The indictment charged Boyle with two separate counts: Count I charged Boyle with violating § 13A-5-40(a)(15), Ala.Code 1975, by murdering a child under the age of 14. Count II charged Boyle with violating § 13A-12-212(a)(l), by possessing a controlled substance — oxycodone and/or Clonazepam.
The only discussion in the record concerning this issue occurred at a pretrial hearing:
“The Court: And there’s an unlawful possession of controlled • substance charge and the capital murder — and also — is that tried with it or separate?
“[Prosecutor]: Right. It arises from the same set of facts, Your Honor. I believe the controlled substances were found during the search of the residence after the death of the child.
“The Court: Is that fall’s understanding that [it] will also be tried along with the capital murder case?
“[Defense counsel]: Like you say, Your Honor, it’s not necessarily the thrust of our case. So we understand it exists. And if the Court wants it consolidated, we would understand that being the case. But we have no preference one way or the other.”
(R. 24) (Emphasis added.) Not only did Boyle not object to the joinder of the offenses, but he specifically said that he had no preference one way or the other. Thus, if any error did occur it was invited by Boyle’s actions. Invited error applies in death-penalty cases and operates to waive the error unless the error rises to the level of plain error. See Williams v. State, 710 So.2d 1276, 1316 (Ala.Crim.App. 1996).
The case relied on by Boyle, Ex parte Tisdale, is readily distinguishable. In Tis-dale the defendant was charged with two separate offenses that had occurred on two separate dates a month a part — a charge of speeding based on an incident in July and a charge of reckless driving based on an incident in August of that same year. On appeal, Tisdale argued that the circuit court erred in consolidating the two charges because, she said, the offenses were separate and unrelated. The Ala *188 bama Supreme Court, in reversing Tis-dale’s convictions, stated:
“Because evidence of each of the incidents would not be admissible in a trial of the other incident, the trial court could hot have properly consolidated the offenses for trial under the ‘same or similar character’ basis for consolidation. As previously noted, the other bases for consolidation set out in Rule 18.3, Ala. R.Crim. P., are not applicable in this case. As a result, the trial court erred when it consolidated the offenses arising from the two incidents.”
990 So.2d at 285.
Rule 13.3(a), Ala. R.Crim. P., provides, in pertinent part:
“(a) Offenses. Two or more offenses may be joined in an indictment, information, or complaint, if they:
“(1) Are of the same or similar character; or
“(2) Are based .on the same conduct or are otherwise connected in their commission; or
“(3) Are alleged to have been part of a common scheme or plan.”
(Emphasis added.) Rule 13, Ala. R.Crim. P., is patterned after Rule 8(a) of the Federal Rules of Criminal Procedure. Thus,
“[i]n deciding consolidation claims under Rule 13.3, Ala. R.Crim. P., this Court has followed the case law interpreting Federal Rule 8. See, e.g., Hinton v. State, 548 So.2d 547, 554 (Ala.Crim.App. 1988), affirmed, Ex parte Hinton, 548 So.2d 562, 566 (Ala.1989), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989); Langham v. State, 494 So.2d 910, 915 (Ala.Crim.App.1986).”
Kennedy v. State, 640 So.2d 22, 28 (Ala. Crim.App.1993). The federal rule has been liberally construed in favor of joinder to facilitate judicial economy. See United States v. Bryan, 843 F.2d 1339, 1342 (11th Cir.1988).
“Rule 13.3 does not exclude the consolidation of a capital offense with another lesser offense.” Williams v. State, 710 So.2d 1276, 1321 (Ala.Crim.App.1996). In fact, the consolidation of two separate capital-murder offenses has specifically been upheld. See Ex parte Hinton, 548 So.2d 562 (Ala.1989). We have upheld consolidation of offenses when the facts of each case overlap or are connected in some way. See Williams, 710 So.2d at 1321. The most important consideration is typically whether evidence of one crime would be admissible in the trial of the other crime. See Ex parte Tisdale, supra.
Moreover,
“[i]t is only the most compelling prejudice that will be sufficient to show the court abused its discretion in not granting a severance. United States v. Perez, 489 F.2d 51, 65 (5th Cir.1973), cert. denied, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). A mere showing of some prejudice is not enough. United States v. Wilson, 657 F.2d 755, 765 (5th Cir.1981), cert. denied, 455 U.S. 951, 102 S.Ct. 1456, 71 L.Ed.2d 667 (1982); Perez, 489 F.2d at 65. Hinton can show no prejudice here, because the evidence of both crimes could have been presented with or without consolidation. No prejudice results where, as here, the jury could easily have kept separate the evidence of the separate crimes. Crawford v. State, 485 So.2d 391, 394-95 (Ala. Crim.App.), cert. denied, 485 So.2d 391 (Ala.1986).”
548 So.2d at 566.
The possession charge was part of the res gestae of the capital-murder charge. Boyle’s neighbor testified that on the morning of October 25, 2005, Boyle telephoned her from the hospital four *189 times and asked her to remove some pills from the master bedroom in the apartment because Boyle said he knew that DHR would investigate and that White might lose her children. These pills formed the basis of the possession charge.
In discussing the res gestae exception to the general exclusionary rule, this Court in Doster v. State, 72 So.3d 50 (Ala.Crim.App. 2010), stated:
“ ‘[One such] “special circumstance” where evidence of other crimes may be relevant and admissible is where such evidence was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts. Commonwealth v. Murphy, 346 Pa.Super. 438, 499 A.2d 1080, 1082 (1985), quoting Commonwealth v. Williams, 307 Pa. 134, 148, 160 A. 602, 607 (1932). This special circumstance, sometimes referred to as the “res ges-tae” exception to the general proscription against evidence of other crimes, is also known as the complete story rationale, i.e., evidence of other criminal acts is admissible “to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.” ’
“Commonwealth v. Lark, 518 Pa. 290, 303, 543 A.2d 491, 497 (1988). Evidence of a defendant’s criminal actions during the course of a crime spree is admissible. See Phinizee v. State, 983 So.2d 322, 330 (Miss.App.2007) (‘Evidence of prior bad acts is admissible to “[t]ell the complete story so as not to confuse the jury.” ’); Commonwealth v. Robinson, 581 Pa. 154, 216, 864 A.2d 460, 497 (2004) (‘The initial assault on Sam-Cali took place approximately two weeks before the Fortney homicide and Sam-Cali’s testimony provided the jury with a “complete story” of Appellant’s criminal spree from the Burghardt homicide in August of 1992 to Appellant’s capture in July of 1993.’); St. Clair v. Commonwealth, 140 S.W.3d 510, 535 (Ky.2004) (‘Here, the trial court properly permitted the Commonwealth to introduce evidence of Appellant’s prior crimes and bad acts that were part of a continuous course of conduct in the form of a “crime spree” that began with Appellant’s escape from an Oklahoma jail and ended with his flight from Trooper Bennett.’); People v. Sholl, 453 Mich. 730, 556 N.W.2d 851 (1996) (‘ “Evidence of other acts is admissible when so blended or connected with the crime of which defendant is accused that proof of one incidentally involves the other or explains the circumstances of the crime.” ’); State v. Charo, 156 Ariz. 561, 565, 754 P.2d 288, 292 (1988) (“‘The ‘complete story’ exception to the rule excluding evidence of prior bad acts holds that evidence of other criminal acts is admissible when so connected with the crime of which defendant is accused that proof of one incidentally involves the other or explains the circumstances of the crime.” ’); State v. Long, 195 Or. 81, 112, 244 P.2d 1033, 1047 (1952) (‘It is fundamental that the state is entitled to the benefit of any evidence which is relevant to the issue, even though it concerns the commission of the collateral crimes. If evidence of a collateral crime tends to prove the commission of the crime charged in the indictment, the general rule of exclusion has no application.’); State v. Schoen, 34 Or.App. 105, 109, 578 P.2d 420, 422 (1978) (‘The evidence, therefore, was relevant to complete the story of the crime charged.... The state is not required to “sanitize” its evidence by deleting background information to the point that the evidence *190 actually presented seems improbable or incredible.’).”
72 So.3d at 87-89.
“The appellant ... failed to demonstrate the ‘actual and compelling’ prejudice necessary to outweigh the benefits of judicial economy resulting from consolidation.” Williams, 710 So.2d at 1321. The circuit court committed no plain error in allowing the joinder of the capital-murder charge and the possession charge.
II.
Boyle next argues that the circuit court erred in failing to conduct any inquiry into Boyle’s pro se request to substitute counsel and that this failure resulted in a violation of his right to counsel.
The record reflects that in November 2005 Scott Stewart was appointed to represent Boyle on the capital-murder charge. (Suppl. C.R. 30.) In January 2006, Mac Downs was appointed as cocounsel for the capital-murder charge. In August 2007, Boyle wrote a letter to Judge David Kimberley stating that he had met with attorneys Stewart and Downs and that Downs told him that he no longer wanted to represent Boyle. Boyle said that he had written numerous times to his attorneys and had gotten no responses and that he wanted new counsel. (C.R.25.) In response to this letter, in August 2007 attorney Downs wrote Judge Kimberley and stated that he had met with Boyle 11 times since being appointed but that he was requesting that he be allowed to withdraw from representing Boyle. (C.R.26.) Judge Kimberley granted Downs’s motion to withdraw and appointed attorney Walt Buttram to represent Boyle. (C.R.29.)
Boyle again wrote Judge Kimberley in August 2008, requesting that Stewart be removed from his case and that another attorney be substituted in his place. (C.R.40.) This letter contains a handwritten note that the motion was denied on August 19, 2008. In August 2008, Boyle also wrote Judge Kimberley and asked that he be allowed to meet with the judge in chambers if Stewart was allowed to continue to represent him; This request was denied. (C.R.41.)
In November 2008, Boyle again wrote Judge Kimberley and stated that Stewart had spoken to two inmates about his case and that he wanted a new attorney appointed. (C.R.46.) The record is unclear as to what occurred as a result of this letter. However, at a December 2008 pretrial hearing Stewart asked that he be allowed to consult with Boyle before the hearing concluded. Nothing in the record of this hearing or anything subsequent to this hearing suggests that Boyle was dissatisfied with Stewart’s representation. (R. 57.)
The record also shows that in July 2009 Boyle wrote Judge Kimberley and said that he had had a meeting with Stewart and that they had discussed important evidence in his case. This letter contained no indication that Boyle was upset with Stewart’s representation or that he wanted Stewart to be removed. (C.R.64.) Moreover, at no time did Boyle express any dissatisfaction with his second attorney — Walt Buttram.
“While an indigent defendant may have the right to be represented by counsel, he has no absolute right to be represented by any particular counsel or by counsel of his choice. Briggs v. State, 549 So.2d 155 (Ala.Cr.App.1989). The essential aim of the Sixth Amendment is to guarantee an effective advocate, not counsel preferred by the defendant. Wheat v. United States, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). The Sixth Amendment does not guarantee a defendant a meaningful relation *191 ship, rapport, or even confidence in court-appointed counsel. Morris v. Slappy, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983); Siers v. Ryan, 773 F.2d 37 (3d Cir.1985), cert. denied, 490 U.S. 1025, 109 S.Ct. 1758, 104 L.Ed.2d 194 (1989).
“The decision to substitute or to remove court-appointed counsel and to appoint new counsel for an accused rests within the sound discretion of the trial court. Boldin v. State, 585 So.2d 218 (Ala.Cr.App.1991); Cox v. State, 489 So.2d 612 (Ala.Cr.App.1985). In order to prevail on a motion for substitution of counsel, the accused must show a demonstrated conflict of interest or the existence of an irreconcilable conflict so great that it has resulted in a total lack of communication that will prevent the preparation of an adequate defense. Boldin v. State; Cox v. State.”
Snell v. State, 723 So.2d 105, 107 (Ala. Crim.App.1998).
Alabama has little law on the circumstances that warrant a hearing on a defendant’s request to substitute counsel, so we have looked to other courts for guidance. The Florida Supreme Court, in what appears to be the prevailing view, stated:
“This Court has consistently found a ... hearing unwarranted where a defendant presents general complaints about defense counsel’s trial strategy and no formal allegations of incompetence have been made. See Davis v. State, 703 So.2d 1055, 1058-59 (Fla.1997); Gudinas [v. State ], 693 So.2d [953] at 962 n. 12 [ (Fla.1997) ]; Branch v. State, 685 So.2d 1250, 1252 (Fla.1996). Similarly, a trial court does not err in failing to conduct a[n] ... inquiry where the defendant merely expresses dissatisfaction with his attorney. See Davis, 703 So.2d at 1058-59; Branch, 685 So.2d at 1252; Dunn v. State, 730 So.2d 309, 311-12 (Fla. 4th DCA1999).”
Sexton v. State, 775 So.2d 923, 931 (Fla. 2000). The Supreme Court of Nebraska has stated:
“Mere distrust of, or dissatisfaction with, appointed counsel is not enough to secure the appointment of substitute counsel. At the hearing on Wabashaw’s second motion, he stated that trial counsel had not given him materials to prepare ‘live questions’ for the witnesses. For this reason — and other similar dis-satisfactions with trial counsel’s conduct — Wabashaw sought to have the court discharge counsel and appoint substitute counsel. Wabashaw did not have the right to choose counsel, and his dissatisfaction with trial counsel was insufficient to secure substitute counsel. Because Wabashaw’s asserted grounds for discharging counsel and appointing new counsel were insufficient, there was no reason for the court to conduct an evi-dentiary hearing.”
State v. Wabashaw, 274 Neb. 394, 403, 740 N.W.2d 583, 593 (2007). The Connecticut Supreme Court has stated:
“The defendant contends that even if the trial court was not required to appoint new counsel, it was at the very least required to inquire into the defendant’s request. We are unpersuaded. ‘Where a defendant voices a “seemingly substantial complaint about counsel,” the court should inquire into the reasons for dissatisfaction.’ McKee v. Harris, [649 F.2d 927], 933 [ (2d Cir.1981) ], quoting United States v. Calabro, 467 F.2d 973, 986 (2d Cir.1972), cert. denied, 410 U.S. 926, 93 S.Ct. 1358, 35 L.Ed.2d 587, reh. denied, 411 U.S. 941, 93 S.Ct. 1891, 36 L.Ed.2d 404 (1973).”
State v. Gonzalez, 205 Conn. 673, 685, 535 A.2d 345, 352 (1987). The Texas Court of Criminal Appeals has stated:
*192 “[A]ppellant maintains that the failure of the court to hold a hearing on his motion to dismiss counsel denied his procedural and substantive due process rights. We disagree. We have found no case law mandating the trial court to sua sponte hold a hearing on this matter.”
Malcom v. State, 628 S.W.2d 790, 792 (Tex. Crim.App.1982). See United States v. Smith, 282 F.3d 758, 764 (9th Cir.2002) (“[T]he failure to conduct a hearing [on the motion to substitute counsel] is not itself an abuse of discretion.”); United States v. Catabro, 467 F.2d 973, 986 (2d Cir.1972) (“If a court refuses to inquire into a seemingly substantial complaint about counsel when he has no reason to suspect the bona fides of the defendant, or if on discovering justifiable dissatisfaction a court refuses to replace the attorney, the defendant may then properly claim denial of his Sixth Amendment right.”). See also Carl T. Drechsler, Withdrawal, Discharge, or Substitution of Counsel in Criminal Case as Ground for Continuance, 73 A.L.R.3d 725 (1976).
Boyle’s complaint was not that counsel was incompetent but that counsel had talked to several inmates about his case. Based on the record we cannot say that the circuit court erred in not holding a hearing on Boyle’s second request to remove one of his attorneys. See Sexton, supra. Moreover, Boyle never expressed any dissatisfaction with his second attorney—Walt Buttram. Accordingly, we find no error in regard to this claim.
III.
Boyle next argues that his constitutional right to a speedy trial was violated by the lengthy delay from his arrest until his trial.
The United States Supreme Court in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), set out four factors to be weighed when determining whether an accused has been denied his constitutional right to a speedy trial. We examine: (1) the length of the delay; (2) the reasons for the delay; (3) the accused’s assertion of his right to a speedy trial; and (4) the degree of prejudice suffered by the accused due to the delay.
In Ex parte Walker, 928 So.2d 259 (Ala. 2005), the Alabama Supreme Court stated:
“ ‘A single factor is not necessarily determinative, because this is a “balancing test, in which the conduct of both the prosecution and the defense are weighed.” ’ Ex parte Clopton, 656 So.2d [1243] at 1245 [ (Ala.1985) ] (quoting Barker [v. Wingo ], 407 U.S. [514] at 530 [ (1982) ]). We examine each factor in turn.”
928 So.2d at 263.

Length of the Delay

“In Alabama, ‘[t]he length of delay is measured from the date of the indictment or the date of the issuance of an arrest warrant—whichever is earlier—to the date of the trial.’ ” Ex parte Walker, 928 So.2d at 264.
Here, Boyle was arrested on November 17, 2005, and was tried in November 2009. Forty-eight months passed from the date of Boyle’s arrest until he was tried.
“A finding that the length of delay is presumptively prejudicial ‘triggers’ an examination of the remaining three Barker factors. [Doggett v. United States,] 505 U.S. [647] at 652 n. 1, 112 S.Ct. 2686, 120 L.Ed.2d 520 [(1992)] (‘[A]s the term is used in this threshold context, “presumptive prejudice” does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay *193 unreasonable enough to trigger the Barker enquiry.’).”
Walker, 928 So.2d at 263-64. The delay in this case was presumptively prejudicial. See State v. Van Wooten, 952 So.2d 1176 (Ala.Crim.App.2006) (29-month delay presumptively prejudicial); Ex parte Anderson, 979 So.2d 777 (Ala.2007) (delays of less than 26 months have been found to be presumptively prejudicial).

Reasons for the Delay

The record reflects that in February 2006, the date Boyle’s case was scheduled for a preliminary hearing, the State moved to continue the hearing, in part, because the final autopsy report had not been completed. In this motion, the State indicated, and it is not disputed in the record, that Boyle did not oppose this continuance. In May 2006, Boyle moved for a mental evaluation. In September 2006, the circuit court ordered that Boyle be mentally evaluated. In January 2007, Boyle moved that his arraignment be continued because, he said, the results of the mental evaluation had not been completed. (Suppl.C.R.65.)
Boyle’s trial was initially scheduled for September 2008. However, in July 2008, Boyle moved to continue that trial date, and the trial was rescheduled to March 2009. In February and March 2009, Boyle moved for continuances and the case was rescheduled to November 2009 — the month Boyle was tried.
“Courts assign different weight to different reasons for delay. Deliberate delay is “weighted heavily’ against the State. [Barker v. Wingo,] 407 U.S. [514] 531 [ (1982) ]. Deliberate delay includes an ‘attempt to delay the trial in order to hamper the defense’ or ‘ “to gain some tactical advantage over (defendants) or to harass them.” ’ 407 U.S. at 531 & n. 32 (quoting United States v. Marion, 404 U.S. 307, 325, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)). Negligent delay is weighted less heavily against the State than is deliberate delay. Barker, 407 U.S. at 531; Ex parte Carrell, 565 So.2d [104,] 108 [ (Ala.1990) ]. Justified delay — which includes such occurrences as missing witnesses or delay for which the defendant is primarily responsible — is not weighted against the State. Barker, 407 U.S. at 531; Zumbado v. State, 615 So.2d 1223, 1234 (Ala.Crim.App.1993) (‘“Delays occasioned by the defendant or on his behalf are excluded from the length of delay and are heavily counted against the defendant in applying the balancing test of Barker.” ’) (quoting McCallum v. State, 407 So.2d 865, 868 (Ala.Crim.App.1981)).”
Ex parte Walker, 928 So.2d at 265.
A good deal of the delays in this case were based on motions made by Boyle and cannot be counted against the State. Therefore, this factor does not weigh in Boyle’s favor.

Assertion of Right

In August 2008, Boyle filed a pro se motion for a speedy trial. The circuit court granted that motion. At a hearing in March 2009, the circuit court called Boyle as a witness and questioned him about continuing the trial. (R. 136.) After a colloquy, Boyle formally waived his right to a speedy trial. (R. 137.) This factor also does not weigh in Boyle’s favor.

Prejudice to Defendant

“Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be im *194 paired.... Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.”
Barker, 407 U.S. at 532.
Boyle asserts that he was prejudiced because H.D. suffered from memory lapses regarding the events of October 2005. Nothing in the record supports this allegation. “ ‘[S]peculative allegations, such as general allegations of loss of witnesses and failure of memories, are insufficient to demonstrate the actual prejudice’ that an appellant must establish.” Haywood v. State, 501 So.2d 515, 518 (Ala. Crim.App.1986), quoting United States v. Butts, 524 F.2d 975, 977 (5th Cir.1975).
Applying the factors set out by the United States Supreme Court in Barker v. Wingo, we cannot say that Boyle was denied his constitutional right to a speedy trial.
IV.
Boyle next argues that the jury venire did not represent a fair cross-section of the community and that this case should be remanded for the Etowah Circuit Court to hold a hearing on the disparity between the representation of blacks on the venire and the actual black population in Etowah County. Boyle asserts in his brief to this Court that the venire consisted of 9.8% blacks but that the population of Etowah County is 14.5% black. Boyle did not raise this issue in the circuit court; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
In declining to find plain error in a similar capital case, this Court in Calhoun v. State, 932 So.2d 923 (Ala.Crim.App. 2005), stated:
“Calhoun never challenged the method of selecting jurors used in Talladega County; therefore, the record contains no information about procedures used in Talladega County for selecting prospective jurors. Neither is there any information in the record concerning the racial makeup of the population of Talladega County. The only information on that subject is contained in Calhoun’s brief. As we stated in Riddle v. State, 669 So.2d 1014, 1016-17 (Ala. Crim.App.1994):
“ ‘[E]xhibits attached to a brief are not evidence and cannot be considered by this Court on appeal. Huff v. State, 596 So.2d 16, 19 (Ala.Cr.App. 1991). “ ‘This Court is bound by the record [on appeal] and may not consider asserted facts which cannot be ascertained [from] th[at] record.’ ” Bush v. State, 616 So.2d 394, 395 (Ala. Cr.App.1993) (quoting Richie v. State, 481 So.2d 454, 455 (Ala.Cr.App.1985)).’
“Calhoun had the burden of establishing a prima facie showing of racial discrimination. As the United States Supreme Court stated in Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979):
“ ‘In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a “distinctive” group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.’
“439 U.S. at 369, 99 S.Ct. 664. Here, Calhoun failed to make even a minimal showing to satisfy the Duren test. There is no plain error here.”
932 So.2d at 939.
Here, the only evidence of the racial composition of Etowah County is contained *195 in Boyle’s brief to this Court — there is no evidence of such composition in the record. Also, the record contains no indication of the method of choosing veniremembers from the Etowah County population. For the reasons discussed in Calhoun, we find that the record fails to establish any Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), violation. Accordingly, we find no plain error in regard to this claim.
V.
Boyle next argues that death-qualifying the jury to determine their views on capital punishment resulted in a conviction-prone jury.
“ ‘In Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court held that the Constitution does not prohibit states from “death qualification” of juries in capital cases and that so qualifying a jury does not deprive a defendant of an impartial jury. 476 U.S. at 173, 106 S.Ct. at 1764. Alabama Courts have consistently held likewise. See Williams v. State, 556 So.2d 737 (Ala.Crim.App.1986), rev’d in part, 556 So.2d 744 (Ala.1987); Edwards v. State, 515 So.2d 86, 88 (Ala.Crim.App. 1987); Martin v. State, 494 So.2d 749 (Ala.Crim.App.1985).’ ”
Lee v. State, 44 So.3d 1145, 1161-62 (Ala. Crim.App.2009), quoting Sockwell v. State, 675 So.2d 4, 18 (Ala.Crim.App.1993).
“A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constitution prohibits the state from ... death-qualifying jurors in capital cases. Id.; Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct.. 1297, 122 L.Ed.2d 687 (1993).”
Davis v. State, 718 So.2d 1148, 1157 (Ala. Crim.App.1995) (footnote omitted).
’ The circuit court committed no error in allowing the prospective jurors to be questioned concerning their views on capital punishment.
VI.
Boyle next argues that the circuit court violated his constitutional right to a fair and impartial jury by excluding two prospective jurors from the venire when, he says, they were qualified to serve as jurors in his case.
First, Boyle argues that the circuit court erred in granting the State’s motion to remove juror C.S.[3] for cause based on her views on the death penalty.
During voir dire, the circuit court asked the venire if any juror was opposed to the death penalty and if the jurors could consider the death penalty even if they had religious or moral objections to the death penalty. Juror C.S. answered in the affirmative. Later, during questioning, C.S. said that she did not know if she could vote for the death penalty and that “[sjitting here today, you know, I’ve always thought I could not do it.” (R. 1118.) The following occurred:
*196 “The Court: [C.S.], even though you may have a religious, moral or conscientious or some other objection to the death penalty, if you are selected as a juror in this case, would you, nevertheless be able to follow my instructions as the judge and fairly consider the imposition of the sentence of death, if appropriate in this case?
“[C.S.]: Fairly consider?
“The Court: Yes.
“[C.S.]: I feel since it would be the first time in my life I had faced that experience that — you know, I guess I feel that, you know, you have these thoughts that you believe. And until you actually experience it, you don’t know what you’re going to do till you’re faced with that experience.
“So yes. When I say yes, I would fairly consider it, gosh, I’m sure — I mean, I’m not sure of how — I feel I would be fairly considering it, but I would still have my — because I would have gone through a trial of hearing something I’d never experienced before, you know, I would never have experienced hearing that myself personally. But I can’t — I don’t know how that would affect how I feel about the death penalty now.
[[Image here]]
“[C.S.]: Well, that’s why I asked — I said I have been through experiences in my life where I didn’t think you know — and until you’re placed in a situation, I mean, I just don’t think there’s ever a hundred percent.
“So when I stand before the judge and say today on this day I pledge that I will be fair—
[[Image here]]
“[C.S.]: I don’t know, because life has dealt me lots of curves and switches.”
(R. 1162-67.) The State moved to dismiss C.S. for cause based on her responses to questions concerning the death penalty, the length of time it took her to answer questions concerning the death penalty, her answers to questions on the juror questionnaire, and the fact that she “visibly agonized” over every answer. (R. 1168.) In granting the State’s motion to excuse C.S. for cause, the circuit court stated: “So because she did not come down firmly on the issue of putting aside her beliefs and her thoughts and her judgment and following the Court’s instructions if it came down to that, I will grant the State’s challenge for cause on [C.S.].” (R. 1178.) Boyle objected to the removal of C.S.
“A trial judge’s finding on whether or not a particular juror is biased ‘is based upon determination of demeanor and credibility that are peculiarly within a trial judge’s province.’ [Wainwright v.] Witt, 469 U.S. [412] 429, 105 S.Ct. [844] 855 [ (1985) ]. That finding must be accorded proper deference on appeal. Id. ‘A trial court’s rulings on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.’ Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981).”
Martin v. State, 548 So.2d 488, 490-91 (Ala.Crim.App.1988).
“ ‘In a capital ease, a prospective juror may not be excluded for cause unless the juror’s views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath.’ Drew v. Collins, 964 F.2d 411, 416 (5th Cir.1992), cert. denied, 509 U.S. 925, 118 S.Ct. 3044, 125 L.Ed.2d 730 (1993) (quotations omitted). ‘[T]his standard likewise does not re *197 quire that a juror’s bias be proved with unmistakable clarity. This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.’ [Wainwright v.] Witt, 469 U.S. [412] at 425-26, 105 S.Ct. [844] at 852-53 [ (1985) ].”
Parr v. Thaler, 481 Fed.App’x 872, 876 (5th Cir.2012).
The above-quoted dialogue clearly showed that juror C.S. had reservations about her ability to vote for the death penalty. The circuit court did not abuse its considerable discretion in granting the State’s motion to excuse C.S. for cause. We find no error in regard to this claim.
B.
Boyle next argues that the circuit court erred in excusing prospective juror B.S. for cause because, he says, even though B.S. had a prior felony conviction he had been given a full pardon; thus, Boyle argues, he was qualified to serve on the jury. The following occurred:
“[B.S.]: My name’s [B.S.]. And back in about 1996, I was convicted of buying and receiving stolen property. I got a ten-year sentence on that. But all my rights has been restored.
“The Court: Is that moral turpitude? “[Prosecutor]: You had a pardon or just your rights restore?
“[B.S.]: Yeah, I got a full pardon. “[Prosecutor]: Full pardon?
“[B.S.]: Uh-huh (indicating yes).
“The Clerk: He has three convictions. Receiving second.
“[Prosecutor]: I think he’s due to be excused.
“The Court: Yeah. Okay. You’re excused.”
(R. 381-82.) Boyle did not object when this juror was excused; therefore, we review this claim for plain error. See Rule 45A, Ala. RApp. P.
Boyle argues on appeal that because B.S.’s civil rights had been restored, he was not disqualified from serving on a jury pursuant to § 12-16-60(a)(4), Ala.Code 1975.
Section 12-16-60(a), Ala.Code 1975, states, in pertinent part: “A prospective juror is qualified to serve on a jury if the juror is generally reputed to be honest and intelligent and is esteemed in the community for integrity, good character and sound judgment and also: ... (4) Has not lost the right to vote by conviction for any offense involving moral turpitude.”
However, § 12-16-150, Ala.Code 1975, provides:
“It is good ground for challenge of a juror by either party:
[[Image here]]
“(5) That he has been convicted of a felony.”
In addressing the interaction of these two statutes, the Alabama Supreme Court in Ex parte Poole, 497 So.2d 537 (Ala. 1986), stated:
“Section 12-16-60 concerns only a prospective juror’s initial qualifications that entitle him to have his name ‘placed in the trial court jury box.’ Code 1975, § 12-16-60(b)(l). The purpose of this section is “to insure at least a reasonable approximation to the requirements that jury venires include all qualified persons, and, hence, represent a cross-section of the community.”’ State ex rel. Gregg v. Maples, 286 Ala. 274, 279, 239 So.2d 198 (1970) (quoting Mitchell v. Johnson, 250 F.Supp. 117 (N.D.Ala. 1966)). The code section that specifically addresses challenges for cause is § 12-16-150. This statute, however, is merely illustrative, Nettles v. State, 435 *198 So.2d 151, 153 (Ala.1983), and a juror may still be challenged for cause on a ground not specifically enumerated in § 12-16-150 but recognized at common law. Nobis v. State, 401 So.2d 191, 197 (Ala.Crim.App.), cert. denied, 401 So.2d 204 (Ala.1981):
“ ‘Ala.Code § 12-16-150 (1975) provides a statutory list of grounds for which a juror may be challenged for cause by either party. Contained within that list is § 12-16-150(7), relied upon by appellant, which states that a challenge for cause lies where a juror “has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict.” In addition to the grounds for challenge for cause under § 12-16-150, grounds for challenge for cause under the common law still exist, when not inconsistent with the section. Mullis v. State, 258 Ala. 309, 62 So.2d 451 (1952); Felton v. State, 46 Ala.App. 579, 246 So.2d 467 (1971).’ (Emphasis added.)
[[Image here]]
“Thus, conviction of a crime of moral turpitude can be a ground for disqualification under § 12-16-60(a)(4) if a person has lost his right to vote. Under § 12-16-150(5), it is a good challenge for cause if the juror ‘has been convicted of a felony.’ (Emphasis added.)”
497 So.2d at 543.
In Jackson v. State, 964 P.2d 875 (Okla. Crim.App.1998), the Oklahoma Court of Criminal Appeals addressed whether a prospective juror — convicted felon whose sentence had terminated — was erroneously struck for cause because, Jackson argued, the prospective ’juror’s civil rights had been restored. The court stated:
“We need not discuss the issue of whether a person’s civil rights, including the right to serve on a jury, are restored upon the termination of a sentence. While juror Stempf may be eligible to serve as a juror in Oklahoma, 22 O.S. 1991, § 658, states that a person who has been convicted of a felony is subject to being excused for cause, with no mention of the status of his civil rights.”
964 P.2d at 884. Oklahoma’s statute regarding strikes for cause is similar to § 12-16-150, Ala.Code 1975.
Section 12-16-150, Ala.Code 1975, provides that a juror may be struck for cause if he/she has a prior felony conviction. This section contains no proviso concerning the restoration of the felon’s civil rights. The fact that B.S. had a prior felony conviction was a valid reason for a challenge for cause under § 12-16-150, Ala.Code 1975, irrespective of whether his civil rights had been restored. The circuit court did not abuse its discretion in removing B.S. for cause based on the fact that he had a prior felony conviction.
VII.
Boyle next argues that the circuit court erred in allowing nine-year-old H.D. to testify because, he says, her young age rendered her incapable of distinguishing between telling the truth and telling a lie; therefore, he argues, her testimony was not reliable.
H.D., the victim’s older sister, was nine years old and in the third grade at the time of trial. Before H.D. testified, the circuit court asked her a series of questions in an attempt to discern whether she knew the difference between the truth and a lie. The following occurred:
“The Court: I need to talk with you a little bit, [H.D.] before we get started. You know the difference between telling the truth and telling a lie?
“[H.D.]: Yes.
“The Court: Okay.... Do you know that you have to tell the truth today?
*199 “[H.D.]: Yes, sir.
“The Court: Do you know — what’s the difference between a truth and a lie? “[H.D.]: That if you tell the truth, you say — like if you’ll — like if you’re wearing blue, that’s a lie, and you’re wearing white, if you are white, it’s a lie.
“The Court: Right. It’s just telling things the way they really are, right? “[H.D.]: (Witness nods head affirmatively-)
“The Court: Do you understand that? “[H.D.]: Uh-huh (indicating yes).
“The Court: Do you understand that if you — if you don’t tell the truth that that’s — you know that’s wrong?
“[H.D.]: Yes, sir.”
(R. 1345 — 46.) At trial, Boyle did not argue that H.D. was not a competent witness. Therefore, we review this claim for plain error. See Rule 45A, Ala. RApp. P.
“Every person is competent to be a witness except as otherwise provided in these rules.” Rule 601, Ala. R. Evid. “Before testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation.... ” Rule 603, Ala. R. Evid. The Advisory Committee’s Notes to Rule 601 recognize:
“[Rule 601] acknowledges the prevailing sentiment that very few persons are incapable of giving testimony useful to the trier of fact and that historic grounds of incompetency — mental incapacity, conviction, etc. — should go to the credibility of the witness and the weight the trier of fact gives to the witness’s testimony.”
In addressing the scope of Rule 601 and Rule 603, Ala. R. Evid., as they relate to child witnessés, the Alabama Supreme Court has stated:
“[T]he adoption of Rule 601, Ala. R. Evid., created in essence a presumption of competency for every witness, and it is the burden of the opponent to challenge the admissibility of the witness’s testimony on grounds other than Rule 601, Ala. R Evid. See, e.g., Rule 602, Ala. R. Evid., and Rule 403, Ala. R. Evid.
“Brown recognizes that under Rule 601, Ala. R. Evid., all witnesses, including children, are competent to testify. He further recognizes the trial court’s duty to determine a child witness’s ability to tell the truth. See Rule 603, Ala. R. Evid. Brown maintains, however, that, in addition to determining whether a child witness understands his or her responsibility to tell the truth when testifying, the trial court should also determine the reliability of the child witness’s testimony. Brown reasons that, because of a child’s age, the child witness may be unable to ‘truly register’ the occurrence he or she observed or the child’s memory may have eroded over time, may be distorted or a false creation, or may have been influenced by the suggestion of adults. According to Brown, because the child witness believes his or her testimony to be true, despite its being the result of imagination, distortion, or suggestion, the admission of the child witness’s testimony without an examination to determine its reliability presents a substantial risk that the testimony will unfairly prejudice the defendant and will mislead the jury.
“We decline Brown’s invitation to require a trial court to conduct an examination to determine the reliability of a child witness’s testimony. The concerns raised by Brown regarding a child witness’s testimony are adequately addressed by our Rules of Evidence.... If a party has concerns about the reliability of a child witness’s testimony, then the party must present his or her concerns in an objection for the trial court *200 based on the Rules of Evidence. Indeed, a trial court’s analysis, conducted after a properly presented Rule 403, Ala. R. Evid., objection, adequately balances concerns regarding the probative value of the child witness’s testimony against unfair prejudice resulting from the frailty of a child’s memories, the tendency of a child to form false memories that he or she believes to be true, and a child’s susceptibility to suggestion that may taint the child’s memory. Hence, Brown’s concerns about the admissibility of a child witness’s testimony based on the reliability of the testimony are adequately addressed by our present rules and procedures. See also Utah v. Fulton, 742 P.2d 1208, 1218 (Utah 1987) (addressing the effect of Rule 601, Utah R. Evid., which is identical to Rule 601, Ala. R. Evid., on the admissibility of a child’s testimony and concluding ‘that Rule 403[, Utah R. Evid.,] adequately protects a defendant’s right to a fair trial and gives him or her an opportunity to raise concerns [with regard to the reliability of a child’s testimony] that prior to our adoption of Rule 601, might have been addressed in a competency hearing’).”
Ex parte Brown, 74 So.3d 1039, 1048-49 (Ala.2011).
This Court has stated the following concerning Rule 601, Ala. R. Evid.:
“Lewis asks that this Court ignore the general rule of competency set out in Rule 601. Instead, he contends, the trial court should make an initial credibility decision as to a witness’s competency to testify, thus depriving the jury of its traditional role in determining witness credibility. Lewis cites no Alabama law, nor can we find any, requiring that, absent some special circumstance, a witness must pass a reliability test before being allowed to testify. Indeed, the cases cited by Lewis all involve special circumstances requiring the trial court to determine the reliability of certain witnesses or evidence before the witness or evidence is presented to the jury.
“We see no reason to limit the liberal application of Rule 601. Nor do we see any reason to limit the jury’s traditional role in determining witness credibility. See, e.g., Cumbo v. State, 368 So.2d 871, 875-76 (Ala.Crim.App.1978), cert. denied, 368 So.2d 877 (Ala.1979) (recognizing that the jury has the responsibility of assessing the credibility of each witness and weighing all the evidence, whether direct or circumstantial, as they viewed it).”
Lewis v. State, 24 So.3d 480, 508-09 (Ala. Crim.App.2006).
Here, the circuit court correctly determined, through voir dire examination of H.D., that H.D. knew the difference between the truth and a lie. Our review of H.D.’s testimony shows that she was articulate and competent to testify. There is no rule requiring the court to first determine that H.D.’s testimony was reliable. Indeed, that was a question within the exclusive province of the finder of fact— the jury. Accordingly, we find no plain error in regard to this claim.
VIII.
Boyle next argues that the circuit court erred in allowing a prior consistent statement made by H.D. to her grandfather to be admitted into evidence. Specifically, he asserts that this testimony improperly bolstered H.D.’s trial testimony and was not admissible under § 15-25-30, Ala.Code 1975, or Rule 801(d)(1)(B), Ala. R. Evid.
Claude Burk, H.D.’s grandfather, testified that as he was helping H.D. get ready to go to her sister’s funeral he asked H.D. if she was okay and if Boyle had done *201 anything to her. Boyle objected and argued that any statements H.D. made to Burk were hearsay. A lengthy discussion was held concerning the admissibility of Burk’s testimony regarding the statement H.D. had made to him. The State argued that the statements were admissible under Rule 801(d)(1)(B), Ala. R. Evid. The circuit court allowed the statements to be admitted. (R. 1589.) Burk testified that H.D. told him that Boyle had slung Savannah in the bathtub and that Boyle had slapped Savannah until she threw up all over her bed. (R. 1590.)
Rule 801(d)(1)(B) states:
“A statement is not hearsay if—
“(1) • • -The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... consistent with declarant’s testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.”
During the cross-examination of H.D., Boyle questioned H.D. as to whether she had ever told any of the facts differently than she had at trial. H.D. answered by saying that she was little at the time of her sister’s death and that she was “saying stuff different” now than at that time. (R. 1376.) Boyle also argued that there was no way of knowing how H.D. had been improperly influenced or whether she was susceptible to information that had been told to her. Boyle did intimate that H.D. “made up” her testimony.
Moreover, if error did occur in the admission of the above statement, any error was harmless beyond a reasonable doubt. During Boyle’s case-in-chief, Boyle presented the testimony of Steve Johnson, a former case worker for the Etowah County DHR. Johnson testified in depth concerning his conversations with H.D. immediately after the victim’s death. (R.1907.) Johnson said that H.D. told him that Boyle threw Savannah in the bathtub and that he drowned her in the tub. Also, both the State and Boyle jointly presented a video disc made of an interview with H.D. at the Barrie Center for Children — a child-advocacy center created to provide a neutral atmosphere in which to interview children. (R.1927.) In that interview H.D. recounted what she observed happen to Savannah. She said that she saw Boyle hit Savannah in the face with his open hand, that she saw Boyle throw Savannah against the wall in the bathtub, and that Savannah got sick and threw up in her bed. Boyle also admitted to an emergency-room employee that he slapped Savannah as he was driving her to the emergency room to keep her awake. In applying the harmless-error analysis, this Court has stated:
“The proper inquiry in determining whether the constitutional error in this case is harmless was set out by the United States Supreme Court in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967):
“ ‘In fashioning a harmless-constitutional-error rule, we must recognize that harmless-error rules can work very unfair and mischievous results when, for example, highly important and persuasive evidence or argument, though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one....
“ ‘. We prefer the approach of this Court in deciding what was harmless error in our recent case of Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 [ (1963) ]. There we said: “The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.” Id,., at 86-87, 84 S.Ct. at 230.... Certainly error, constitutional error, in illegally *202 admitted highly prejudicial evidence or comments, easts on someone other than the person prejudiced by it a burden to show that it was harmless. It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was not injury or to suffer a reversal of his erroneously obtained judgment. There is little, if any, difference between our statement in Fahy v. State of Connecticut about “whether there is a reasonable possibility that the evidence complained of did not contribute to the conviction” and requiring the beneficiary of a constitutional error to prove beyond a- reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our Fahy case when we hold, as we now do, that before a federal constitutional error can be held harmless the court must be able to declare a belief that it was harmless beyond a reasonable doubt. While appellate courts do not ordinarily have the original task of applying such a test, it is a familiar standard to all courts, and we believe its adoption will provide a more workable standard ¡... ’
“386 U.S. at 23-24, 87 S.Ct. 824.
“ ‘In order for the error to be deemed harmless under Rule 45, [Ala. R.App. PJ, the state must establish that the error did not injuriously affect the appellant’s substantial rights.’ Coral v. State, 628 So.2d [954] at 973 [ (Ala.Crim.App.1992) ].”
Young v. State, 730 So.2d 1251, 1255 (Ala. Crim.App.1998). We hold that any error in the admission of the statement H.D. made to Burk was cumulative of other lawful testimony and was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). For these reasons, we find no plain error in the admission of Burk’s testimony regarding H.D.’s statements to him.
IX.
Boyle next argues that the circuit court erred in not allowing Layla Padgett, a counselor at the Barrie Center for Children, to testify concerning H.D.’s “character for untruthfulness.” He argues that the circuit court erroneously excluded her testimony “[bjecause Ms. Padgett could testify only to her personal opinion and not [H.D.’s] reputation in the community_” (Boyle’s brief, at p. 58.)
The record shows that Boyle informed the State that he intended to call Padgett to testify. The State objected; a lengthy discussion ensued. The circuit court stated:
“Well, let me say this: We’ve kind of got a — we’re kind of seemingly mixing and matching rules of evidence here. Looks like we’re — what the defense wants to do is take a [Rule] 608(a) [,Ala. R. Evid.,] approach to attack the credibility of the witness for her reputation for truthfulness, but sort of do it by specific instances of contact, which is impermissible.
“So I guess — and I don’t know, we may have to hear from her independently. If she is qualified to give a statement regarding — and I haven’t really thought about the issues of her confidentiality, how that would play into it as a counselor.
“But is — I guess she could technically in [Rule] 608(a), if she’s qualified as a counselor, not as a friend or acquaintance, get — have an opinion concerning reputation for truthfulness. That, technically, would be, I guess, admissible if *203 she’s a competent witness to do that, but certainly not on any specific instance of conduct or any particular — she certainly couldn’t testify in any regard — in regard to [Rule] 608(b).
“She may be able to give an opinion for her character for truthfulness or untruthfulness. I think that would be the limit of it.
[[Image here]]
“But I think — you know, I’ve got to come down on this thing pretty squarely on [Rule] 608(a). And I don’t even know — really I’m not convinced in my mind she’s that type of witness; that she has an opinion concerning [H.D.’s] general reputation in the community for truthfulness or untruthfulness.
“And that’s kind of a stretch to say that [H.D.] has got a reputation in the community for truthfulness or untruthfulness. But I’m willing to let you put her on the stand and ask her about that and see if she has that type of knowledge or is competent to testify in that regard.”
(R.2009-13.) Boyle’s attorneys indicated that they needed to discuss the matter. After a short break, the circuit court asked defense counsel if they intended to make an offer of proof concerning Padgett’s testimony. Boyle said that he wished to talk to Padgett when she arrived at the courthouse. Sometime later, the prosecutor stated for the record: “[A]ll the parties concede that the predicate for that testimony could not be laid based on the information [Padgett] relayed and Ms. Padgett has been released by the defense.” (R.2033.) Boyle acknowledged his agreement with the State’s assessment of the issue. (R.2033.) Therefore, if any error did occur, it was invited by Boyle’s actions. Invited error is waived unless it rises to the level of plain error. See Saunders v. State, 10 So.3d 53, 88 (Ala.Crim.App.2007).
Moreover,
“[A] foundation must ... be established before opinion testimony about a witness’s character for truthfulness is admissible. Specifically, before a witness can offer an opinion on another witness’s truthfulness, it must be established that the character witness is ‘sufficiently personally familiar with [the primary witness’s] character to offer an opinion on the subject.’ ...
“While ‘[t]he reputation witness must have sufficient acquaintance with the principal witness in his community in order to ensure that the testimony accurately reflects the community’s assessment, ... the opinion witness is not relating community feelings.’ United States v. Watson, 669 F.2d [1374] at 1382 [(11th Cir.1982) ]. Instead, the opinion witness testifies from personal knowledge and relates a personal impression of the primary witness’s character for truthfulness. United States v. Watson, 669 F.2d at 1383. See also Tenn. R. Evid. 602. Therefore, to establish admissibility of opinion testimony, it is necessary to demonstrate ‘that the opinion is rationally based on the perception of the witness and would be helpful to the jury in determining the fact of credibility.’ United States v. Dotson, 799 F.2d 189, 193 (5th Cir. 1986).”
State v. Dutton, 896 S.W.2d 114, 118 (Tenn.1995) (emphasis added).
“The witness must qualify to give an opinion by showing such acquaintance with the defendant, the community in which he [or she] has lived and the circles in which he [or she] has moved, as to speak with authority of the terms in which generally he [or she] is regarded.”
*204 Michelson v. United States, 335 U.S. 469, 478, 69 S.Ct. 213, 93 L.Ed. 168 (1948).
The record affirmatively shows that a proper foundation could not be established for the admission of Padgett’s opinion testimony concerning H.D.’s character for untruthfulness. Accordingly, we find no error, much less plain error, in regard to this claim.
X.
Boyle next argues that the circuit court erred in allowing Cathy Horton, a nurse at the Riverview emergency room, to testify that someone told her that Boyle had said that “he had slapped the child.”
The following occurred during Horton’s testimony: '
“[Prosecutor]: But do you remember him saying to you or somebody in your presence that [Boyle] — that [Boyle] had, at some point, slapped the child? Do you remember him saying that at all? “[Horton]: I remember that being told to me, but I did not hear it said by him. “[Prosecutor]: So you don’t know if he said it? Somebody told you at some point?
“[Horton]: Someone told me he had said that.”
(R. 1621-22.) Boyle did not object to Horton’s testimony; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
If any error did occur in admitting the above statement, the error was harmless beyond a reasonable doubt. Chapman v. California, supra. Emily Millican, now a nurse at the Riverview emergency room and a former patient-care assistant, testified that she was present in the emergency room when Boyle brought the victim to the hospital and that Boyle told her that he was “slapping [Savannah] on the face to keep her awake” as he was driving to the hospital. (R. 1518.)[4] “Testimony which may be apparently illegal upon admission may be rendered prejudicially innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred.” Thompson v. State, 527 So.2d 777, 780 (Ala.Crim.App.1988). “The erroneous admission of evidence that is merely cumulative is harmless error.” Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App. 1995). Accordingly, we find no plain error in the admission of Horton’s testimony.
XI.
Boyle next argues that the circuit court erred in not allowing him to call Melissa White, the victim’s mother, to testify. Specifically, Boyle argues that before White could invoke her Fifth Amendment privilege against self-incrimination she was required to take the witness stand and invoke that right in the presence of the jury.
The record reflects that during trial the State notified the court that it had examined Boyle’s subpoena list and discovered White’s name was on the list. The prosecutor said that White intended to invoke her Fifth Amendment right not to testify. White’s attorney, who was in court at this hearing, informed the circuit court that White had been charged with aggravated child abuse and possession of a controlled substance arising out of this incident, that she also had new charges, and that White intended to invoke her *205 privilege not to testify if called to the witness stand. White’s attorney said: “She’s not going to get up there and potentially perjure herself and/or harm herself with whatever testimony she may give at all. So she absolutely will take the Fifth. And we’re asking that neither party be allowed to call her as a witness and put her in that position.” (R. 1814-15.)
Boyle objected and argued that he had a right to call any witness he desired. The State asserted that the circuit court could not allow a codefendant to testify knowing that the codefendant fully intended to invoke the Fifth Amendment right not to testify. The circuit court held that it was not necessary to make White appear in court because it was clear she intended to invoke her Fifth Amendment right not to testify. (R. 1884.)
The record reflects that sometime later White appeared in the judge’s chambers and was questioned under oath. At this hearing, Boyle argued that White should have been called to testify in the presence of the jury. The State asserted that according to Rule 512(b), Ala. R. Evid., the preferred practice was to conduct the hearing outside the presence of the jury.[5] White informed the circuit court that if called to testify she fully intended to invoke her Fifth Amendment privilege against self-incrimination, that that decision was voluntary after consulting with her attorney, and that it was her sole decision not to testify. (R.2046-48.)
“States generally have followed the federal court’s approach when confronted with the question of whether a defendant can force a witness to ‘take the Fifth’ in the presence of the jury. The majority of courts have held that a witness cannot be forced to the stand just to have her ‘take the Fifth’ in front of the jury. The minority of courts allow the judge to use his discretion in determining whether the witness should take the stand.”
Terrence Kerwin, Compulsory Process and the Right to Present a Defense: Why a Criminal Defendant Should Have the Ability to Force a Witness Who Will ‘Take the Fifth’ to do so in Front of the Jury, 112 Penn St. L.Rev. 659, 669-70 (2007). See Martin v. United States, 756 A.2d 901, 905 (D.C.2000) (“A witness should be questioned outside the presence of the jury when it is clear that the witness will refuse to testify on the basis of any privilege or reason.”). The above-cited article characterizes Alabama as a minority jurisdiction that allows the trial court to use its discretion in determining whether the witness invoking his or her Fifth Amendment right should be questioned in the presence of the jury. Rule 512(b), Ala. R. Evid., clearly supports this interpretation. Rule 512(b) provides: “In jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury.”
This Court has held that it is error for the State to call a codefendant knowing that the codefendant will invoke his or her Fifth Amendment right against self-incrimination. See Thomas v. State, 473 So.2d 627 (Ala.Crim.App.1985). In Thomas, we stated:
“ ‘It is error for the prosecution to call an accomplice or another witness to testify for the state if he knows the witness will invoke the Fifth Amendment.’ N. Chiarkas, Alabama Criminal Trial Practice 219 (1981). See Busby v. State, *206 412 So.2d 837 (Ala.Cr.App.1982); Shockley v. State, 335 So.2d 659 (Ala.Cr.App. 1975), affirmed, 335 So.2d 663 (Ala. 1976); Allison v. State, 331 So.2d 748 (Ala.Cr.App.), cert. denied, 331 So.2d 751 (Ala.1976).
“The general rule is stated in Annot., 19 A.L.R.4th 368, 373 (1983):
“‘[I]t is improper for the prosecution to call as a witness one whom it knows will certainly invoke the privilege against testifying on the ground of self-incrimination, with the sole purpose or design of having the jury observe that invocation. Obviously, it is difficult to demonstrate that the prosecution had this sole purpose or design, and it would be necessary, in any event, to demonstrate prejudice to the accused in order to effect the reversal of a conviction.’ ”
473 So.2d at 629-30. This rationale has been applied to defense counsel as well as the prosecution.
“[I]t was improper for defense counsel to call [the accomplice] as a witness, knowing that [the accomplice] planned to invoke the Fifth Amendment. This was an apparent attempt to have the jury infer [the accomplices’s] guilt from his assertion of rights.”
Robinson v. State, 728 So.2d 650, 655 (Ala. Crim.App.1997).
. “The tactic of defense counsel was to in effect have the jury draw an inference of guilt from Alexander’s exercise of the right against self-incrimination. Alexander’s testimony was properly excluded in that it ‘would have had no bearing on the case’ nor would it have ‘enlightened the jury as to any material aspect in the case.’ Hurst [v. State,] 397 So.2d [203] at 207 [ (Ala.Crim.App.1981) ]. The trial court’s exclusion of this witness’s testimony was, therefore, proper.”
Garner v. State, 606 So.2d 177, 181 (Ala. Crim.App.1992).
“ “When an alleged accomplice invokes the privilege in the presence of the jury, prejudice arises from the human tendency to treat the claim of privilege as a confession of crime, creating an adverse inference which an accused is powerless to combat by cross-examination.’ State v. Allen, 224 N.W.2d 237, 241 (Iowa, 1974).”
People v. Giacalone, 399 Mich. 642, 645, 250 N.W.2d 492 (1977) (footnotes omitted). See also Annot., Wanda Ellen Wakefield, Propriety and Prejudicial Effect of Prosecution’s Calling as Witness, to Extract Claim of Self-incrimination Privilege, One Involved in Offense Charged Against Accused, 19 A.L.R.4th 358 (1983).
Based on the record in this case, we cannot say that the circuit court abused its discretion in not calling White in the jury’s presence, knowing that she fully intended to invoke her Fifth Amendment privilege against self-incrimination.
XII.
Boyle next argues that the circuit court erred in allowing certain photographs taken of the apartment where the victim lived and where she was beaten to be admitted into evidence. Specifically, Boyle asserts that it was error to allow photographs of Boyle holding an alcoholic beverage and photographs of a crack pipe to be admitted into evidence because, he says, the photographs were irrelevant and prejudicial.
Charles Clifton, a former sergeant with the Rainbow City Police Department, testified that on October 26, 2005, he was dispatched to White’s apartment in response to a possible child-abuse report. Clifton identified State’s exhibits 30 through 85 as photographs of the interi- or and the exterior of the apartment where *207 the victim was living at the time of her death and where the alleged offense occurred. (R. 1645.) Boyle asserts that State’s exhibits 26, 75, 76, and 86 were improperly admitted. State’s exhibit 26 is a piece of cardboard with three photographs of Boyle arranged on the cardboard. In one of the photographs Boyle is holding three bottles. It is unclear what the bottles are but they appear to be bottles of foreign beers. Boyle objected to the admission of this exhibit, arguing that the photograph showed Boyle “in a compromising position with alcohol” and that the photograph had no relevance. (R. 1673; 1677.) State’s exhibit 74 is a picture of a table with a “Pearl River” casino bucket and a pipe folded into a napkin. Clifton testified that this photograph showed a casino bucket and a “crack pipe” Clifton had found in the master bedroom. Boyle also did not object when this photograph was admitted into evidence. (R. 1645.) State’s exhibit 75 is a photograph of an empty bottle. It is unclear what the bottle contained because the label appears to be written in a foreign language. Boyle did not object when this photograph was admitted into evidence. (R. 1645.) State’s exhibit 76 is a picture of three bottles of Crown Royal brand whiskey that are on a table in the apartment. Boyle also did not object when this photograph was admitted into evidence. (R. 1645.) State’s exhibit 86 is a photograph of the original exhibit 26.
“Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 389 So.2d 1100, 1102 (Ala.Cr.App.1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So,2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986) (videotape evidence).”
Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989).
“The fact that a photograph has very little probative value does not prevent its admission in evidence where the photograph will tend to shed light on, strengthen or illustrate the truth of other testimony, or where the photograph has reasonable tendency to prove or disprove some material fact or issue in the case, or is used to identify the deceased or to illustrate the location, nature or extent of a wound. Gilmore v. State, 346 So.2d 1193 (Ala.Cr.App.1977). The evidentiary rule in this state favors the admission of photographs and affords the trial court a wide and liberal latitude in the admission of photographs illustrative of a criminal transaction and the surrounding circumstances. Arnold v. State, 348 So.2d 1092 (Ala.Cr.App.1977), cert. denied, Ex parte Arnold, 348 So.2d 1097 (1977); Lewis v. State, 339 So.2d 1035 (Ala.Cr.App.1976), cert. denied, 339 So.2d 1038 (Ala.1976).”
Lawrence v. State, 409 So.2d 987, 990 (Ala. Crim.App.1982). “Pictures of the scene of the homicide taken a short time thereafter are admissible in evidence.” Smarr v. State, 260 Ala. 30, 34, 68 So.2d 6, 9 (1953). “Where the defendant is charged with the possession, sale or use of drugs, other controlled substances found at the time and the scene of the crime may be admissible to show the ‘complete story.’ ” Maul *208 din v. State, 402 So.2d 1106, 1110 (Ala. Crim.App.1981). “Our appellate courts on several occasions have held that evidence of other drugs is permissible where they would show the ‘complete story.’ ” Fowler v. State, 440 So.2d 1195, 1197 (Ala.Crim. App.1983).
“[T]he photographs of the interior of the victim’s bedroom were properly admitted into evidence. ‘The photographs were not immaterial but were illustrative of the crime scene and corroborative of the testimony of ... the first policeman to arrive on the scene.... A photograph “is competent evidence of anything, of which it is competent and relevant for a witness to give a verbal description.” 23 C.J.S. Criminal Law § 852(l)(a) (1961).’ Harrell v. State, [470 So.2d 1303] at 1307 [ (Ala.Crim.App.1984) ].”
Hill v. State, 516 So.2d 876, 881 (Ala.Crim. App.1987).
The photographic evidence was either relevant to show the crime scene, relevant and admissible to prove Boyle’s conviction for possession of a controlled substance, or relevant to prove the “complete story” of what occurred in the apartment before Savannah’s death. The circuit court did not abuse its discretion in allowing the above photographic evidence to be admitted.
XIII.
Boyle next argues that it was reversible error for State’s witness Kim Parr to testify that Boyle had had prior contact with law enforcement, a violation, he says, of the Alabama Supreme Court’s decision in Ex parte Johnson, 507 So.2d 1351 (Ala. 1986).
The following occurred during direction examination of Parr:
“[Prosecutor]: And tell the jury, if you will, how you came to see [the victim] that dayi I don’t want — don’t go into all of it, but just how you came to go to see [the victim],
“[Parr]: His bond had been—
“[Prosecutor]: Whoa, whoa. Don’t get into that. Just talk about where you saw [the victim] and when.
“[Parr]: I’m sorry.
“[Prosecutor]: Where you saw her and ' when.
“[Parr]: I saw her at the apartment.”
(R. 1395.) Boyle did not object when this testimony was admitted; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
This case is readily distinguishable from the case relied on by Boyle. In Johnson, the Alabama Supreme Court held that it was plain error for the circuit court to allow the admission of Johnson’s fingerprint card because it revealed his past criminal conduct. Here, the reference was not to any prior arrest or conviction but to “his bond.”
“Evidence of prior crimes or bad acts may not be presented at trial to establish the defendant’s criminal character or proclivities. Commonwealth v. Padilla, 923 A.2d 1189, 1194 (Pa.Super.2007), appeal denied, 594 Pa. 696, 934 A.2d 1277 (2007). This rule is violated where evidence presented to the jury either expressly, or by reasonable implication, indicates that the defendant has engaged in other criminal activity. Id., at 1195. However, mere passing reference to prior criminal activity is insufficient to establish improper prejudice by itself. Id. The inquiry into whether prejudice' has accrued is necessarily a fact specific one. Id.
[[Image here]]
“[W]e conclude that [the witness’s] testimony regarding [the defendant’s] *209 probation or parole officer was inadvertent .... The prosecutor did not ask a question that could have been reasonably foreseen to elicit evidence of [the defendant’s] prior criminal activities. Furthermore, [the witness’s] testimony constituted a mere passing reference to [the defendant’s] prior criminal activity....”
Commonwealth v. Hudson, 955 A.2d 1031, 1034 (Pa.Super.2008).
The admission of the statement “his bond” did not rise to the level of the evidence that was admitted and found objectionable in Johnson. First, Parr used the phrase “his bond,” and she did not specifically identify Boyle or anyone by name. Second, Parr did not have the opportunity to elaborate on her testimony because the prosecutor stopped her from finishing her sentence. There is no indication that this limited unsolicited testimony was evidence of any prior misconduct on Boyle’s part. Given the facts of this case, if any error did occur, it was harmless beyond a reasonable doubt.. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
XIV.
Boyle next argues that the circuit court erred in allowing his prior bad acts to be admitted into evidence. Specifically, he argues that the circuit court should have excluded testimony that Boyle had hit the victim’s head against a car door, that Boyle had burned the victim with a cigarette, and that Boyle had hit the victim’s head against the bathroom wall. Boyle further asserts that the admission of the evidence violated Rule 404(b), Ala. R. Evid., that he was not given notice of the State’s intent to present this evidence, and that no limiting instruction was given on the use of the evidence.
The record indicates that the State filed a notice of intent to offer Rule 404(b), Ala. R. Evid., evidence. This notice stated that the State intended to present
“Testimony and other evidence of pri- or acts of physical abuse inflicted upon the victim in this case by [Boyle] during the months prior to the victim’s death. Details regarding the aforesaid acts will be provided to counsel upon request. This notice is filed despite the fact that no formal request has been filed by defense counsel herein.
“All such potential evidence and testimony is hereby submitted as part and parcel of the State’s discovery and compliance declaration, previously filed in this cause.”
(C.R.52.) At a pretrial hearing, the prosecutor said that the autopsy report showed various injuries that would support the Rule 404(b), Ala. R. Evid., evidence. (R. 86.) Boyle moved that the State disclose the prior alleged “wrong/crimes/acts” that it intended to introduce at trial. (C.R.67-68.) The State indicated that it expected to offer testimony regarding the victim’s previous injuries, that it intended to present evidence regarding Boyle’s own statements concerning those injuries, and that defense counsel was “well aware of th[o]se witnesses and th[o]se allegations.” (R. 176-77.) The circuit court issued the following order:
“[Boyle’s] motion for disclosure of any alleged prior wrongs, crimes, or acts the State intends to introduce at trial is moot, as the State expects no evidence in regards to any prior convictions in its case in chief and any information it does have in regards to prior wrongs or acts was provided in the disclosures of February 2009.”
(C.R.85.) Boyle then filed a written objection to the State’s use of Rule 404(b), Ala. R. Evid., evidence. (C.R.120.) The State *210 responded that it intended to introduce evidence concerning the cigarette burn to the victim’s ankle and the bruises on her forehead. (R. 225.) Immediately before trial, Boyle again objected to the introduction of the Rule 404(b) evidence. The circuit court ruled that Boyle had been given sufficient notice of the evidence and that the evidence was admissible. (R. 1306.)
Rule 404(b), Ala. R. Evid., provides:
“Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause show, of the general nature of any such evidence it intends to introduce at trial.”
(Emphasis added.)
A.
Boyle first argues that the notice given by the State was not sufficient. Specifically, he argues that the State “refused to disclose the exact nature of that evidence,” and that the notice should have included the “specific bad acts and testifying witnesses it [intended] to use at trial.” (Boyle’s brief, at p. 74.)
“Rule 404(b), Ala. R. Evid., is identical to Rule 404(b), Fed.R.Evid. ‘[CJases interpreting the Federal Rules of Evidence will constitute authority for construction of the Alabama Rules of Evidence.’ ” Ex parte Billups, 86 So.3d 1079, 1085 n. 4 (Ala. 2010). The United States Court of Appeals for the District of Columbia has stated the following concerning the adequacy of the government’s notice of its intent to use Rule 404(b) evidence:
“Defendant next challenges the government’s notice on the ground that it lacks specificity. Defendant contends that Rule 404(b) requires that the government provide specific information, such as the ‘date, time [and] place for the alleged actions,’ ‘any person who potentially was involved,’ the ‘names, dates, persons involved and a particularized identification of the arrangement referenced,’ and a ‘delineation] [of the] reasons’ for which the evidence is offered.
“Defendant’s argument for a more particularized notice is without foundation. The text of Rule 404(b) indicates that the government need only describe the ‘general nature’ of the evidence it intends to introduce. Fed. R.Evid. 404(b). In fact the Advisory Committee considered and rejected the ‘particularity requirement suggested by the defendant when it amended Rule 404(b) to establish the pretrial notice requirement. As the Advisory Committee noted: ‘[N]o specific form of notice is required.... Instead, the Committee opted for a generalized notice provision which requires the prosecution to apprise the defendant of the general nature of the evidence of the extrinsic acts.’ Id.
“Moreover, courts have routinely denied requests by defendants for greater particularity in 404(b) notice. See, e.g., United States v. Kern, 12 F.3d 122, 124 (8th Cir.1993) (holding'that the government’s statement that it ‘might use evidence from some local robberies’ was sufficient to describe the general nature of the acts under Rule 404(b)); United States v. Schoeneman, 893 F.Supp. 820 (N.D.Ill.1995) (holding that the govern *211 ment need not ‘turn over specific eviden-tiary detail’ in 404(b) notice); United States v. Rusin, 889 F.Supp. 1035, 1036 (N.D.Ill.1995) (rejecting defendant’s argument that Rule 404(b) notice requires the government to disclose ‘dates, places, and persons involved in the specific acts; documents that pertain to the acts, a statement of the issues to which the government believes such evidence may be relevant....’).”
United States v. Watt, 911 F.Supp. 538, 556 (D.D.C.1995). See United States v. Watson, 409 F.3d 458, 466, 366 U.S.App. D.C. 188,196 (2005).
The State’s notice in this case was sufficient to comply with the notice requirements of Rule 404(b), Ala. R. Evid. It was not necessary for the State to specifically identify the dates, times, or people it intended to present at trial. See United States v. Watt, supra.
Moreover, Alabama has long held that in a murder trial prior acts of violence or cruelty to the victim are admissible to show intent and motive. As this Court has stated:
“The testimony concerning the appellant’s other prior bad acts against the victim and her brother was also admissible as exceptions to the exclusionary rule. . Evidence of these other bad acts was not admitted to show the appellant’s bad character, but rather was admissible under the motive, intent, and common plan or scheme exceptions to the exclusionary rule.
“ ‘ “In a prosecution for murder, evidence of recent abuse to the child by the accused is admissible to show ‘intent, motive or scienter.’ ... Acts of hostility, cruelty, and abuse by the accused toward his homicide victim may be proved by the State for the purpose of showing motive and intent- This is ‘another of the primary exceptions to the general rule excluding evidence of other crimes.’ ” Phelps v. State, 435 So.2d 158, 163 (Ala.Cr.App.1983) (citations omitted). See also Baker v. State, 441 So.2d 1061, 1062 (Ala.Cr.App.1983).’
“Eslava v. State, 473 So.2d 1143, 1146 (Ala.Cr.App.1985). See also Burkett v. State, 439 So.2d 737, 748-49 (Ala.Cr. App.1983).”
Harvey v. State, 579 So.2d 22, 26 (Ala. Crim.App.1990). See also Burgess v. State, 962 So.2d 272 (Ala.Crim.App.2005).
For the foregoing reasons, we find no error in regard to this claim.
B.
Boyle next argues that the circuit court erred in failing to sua sponte give a limiting instruction on the use of the prior bad act evidence. Boyle did not request a limiting instruction; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
Recently, in Ex parte Billups, 86 So.3d 1079 (Ala.2010), the Alabama Supreme Court held that an overbroad limiting instruction on the use of prior bad act evidence that allows the jury to consider the evidence for an improper purpose constitutes plain error. However, the Supreme Court left undisturbed its earlier holding in Johnson v. State, 120 So.3d 1119 (Ala. 2006), that a trial court has no duty to sua sponte give a limiting instruction when the prior bad act evidence is offered as substantive evidence of guilt. In addressing the Supreme Court’s decision in Johnson v. State, this Court has stated:
“Dotch argues that the trial court committed plain error by failing to sua sponte give limiting instructions to the jury concerning its use of the prior-conviction evidence. However, in a similar case, the Alabama Supreme Court *212 has held that such limiting instructions are not necessary because, as in the present case, the prior convictions were being introduced as substantive evidence. Johnson v. State, 120 So.3d 1119 [ (Ala.2006) ].
“Although Dotch cites Ex parte Minor, 780 So.2d 796 (Ala.2000), and Snyder v. State, 893 So.2d 482 (Ala.2001), in support of his claim, the Alabama Supreme Court in Johnson v. State, 120 So.3d at 1128, distinguished those cases from the present situation, because in those cases, the prior-conviction evidence was being introduced to impeach the defendants’ credibility. In those cases, the prior convictions were not substantive evidence of the offenses. The Court wrote:
“ ‘It is contradictory and inconsistent to allow, on the one hand, evidence of Johnson’s prior bigamy conviction and prior bad acts as substantive evidence of the offense with which she was charged, yet, on the other hand, to require a limiting instruction instructing the jury that it cannot consider the evidence as substantive evidence that Johnson committed the charged offense.’
“Johnson v. State, 120 So.3d at 1128.”
Dotch v. State, 67 So.3d 936, 969-70 (Ala. Crim.App.2010).
Here, the prior bad acts were admitted as substantive evidence of guilt and not for impeachment purposes. Thus, the circuit court committed no plain error in failing to sua sponte give a limiting instruction on the use of the Rule 404(b) evidence.
More importantly, we believe that the record shows that the prior acts of abuse Boyle inflicted on Savannah were admissible as part of the res gestae — the events leading to her death. See Doster v. State, 72 So.3d 50, 87-89 (Ala.Crim.App.2010). The Alabama Supreme Court in Johnson v. State, 120 So.3d 119, specifically recognized that no limiting instruction is necessary when the prior bad acts are admitted as part of the res gestae of the charged crime. The Supreme Court stated:
“Other jurisdictions that have considered this issue have concluded that a limiting instruction is not required when evidence of other crimes or prior bad acts is properly admitted as part of the res gestae of the crime with which the defendant is charged. See People v. Coney, 98 P.3d 930 (Colo.Ct.App.2004) (holding that evidence of other offenses or acts that are part and parcel of the charged offense is admissible as res ges-tae and may be admitted without a limiting instruction); State v. Long, 173 N.J. 138, 171, 801 A.2d 221, 242 (2002) (evidence of the defendant’s actions ‘served to paint a complete picture of the relevant criminal transaction’ and therefore was admissible, and a limiting instruction was unnecessary because the evidence was admitted under the res ges-tae exception); and Camacho v. State, 864 S.W.2d 524, 535 (Tex.Crim.App. 1993) (holding the evidence of the extraneous offenses showed the context in which the criminal act occurred, i.e., the res gestae, and was therefore admissible and not subject to the requirement of a limiting instruction).”
Johnson, 120 So.3d at 1130. See also Revis v. State, 101 So.3d 247, 317 (Ala.Crim.App. 2011).
Accordingly, we conclude there was no “miscarriage of justice that would cause a loss of confidence in the validity of judicial proceedings”; thus, there was no plain error in the circuit court’s failure to sua sponte give a limiting instruction. See Ex parte Martin, 931 So.2d 759, 769 (Ala. 2004).
*213 XV.
Boyle next argues that the circuit court erred in allowing drugs and a “crack pipe” to be admitted into evidence without a proper chain of custody.
Boyle did not object when these items were admitted at trial. As we stated above, because this issue goes to Boyle’s conviction for possession of a controlled substance, an objection was necessary to preserve the issue for appellate review. See Ex parte Woodall, 730 So.2d 652 (Ala. 1998). Therefore, this claim is not properly before this Court.
Moreover,
“The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence. Williams v. State, 375 So.2d 1257 (Ala.Cr.App.), cert. denied, 375 So.2d 1271 (Ala.1979); Tate v. State, 435 So.2d 190 (Ala.Cr.App.1983); Smith v. State, 446 So.2d 68 (Ala.Cr.App.1984). ‘The evidence need not negate the most remote possibility of substitution, alteration, or tempering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain.’ Slaughter v. State, 411 So.2d 819, 822 (Ala.Cr.App.1981) (emphasis supplied).”
Williams v. State, 505 So.2d 1252, 1253 (Ala.Crim.App.1986).
“ ‘ “In order to establish a proper chain, the State must show to a ‘reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.’ ” ’ Ingram v. State, 779 So.2d 1225, 1254 (Ala.Crim.App. 1999) (quoting Ex parte Holton, 590 So.2d [918,] at 919-20 [ (Ala.1991) ] (citation omitted in Holton)), aff'd, 779 So.2d 1283 (Ala.2000), cert. denied, 531 U.S. 1193, 121 S.Ct. 1194, 149 L.Ed.2d 109 (2001). ‘[Ejvidence that an item has been sealed is adequate circumstantial evidence to establish the handling and safeguarding of the item.’ Lane v. State, 644 So.2d 1318, 1321 (Ala.Crim. App.1994); see also Ingram v. State, 779 So.2d at 1254. Additionally, ‘ “[c]hain of custody requirements do not apply with the same force to items of evidence which are unique and identifiable in themselves.” ’ Ex parte Scott, 728 So.2d 172, 182 (Ala.1998) (quoting Magwood v. State, 494 So.2d 124, 144 (Ala.Crim.App. 1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986)), cert. denied, 528 U.S. 831, 120 S.Ct. 87, 528 U.S. 831 (1999).”
Martin v. State, 931 So.2d 736, 748-49 (Ala.Crim.App.2003), rev’d in part on unrelated ground, 931 So.2d 759 (Ala.2004).
Sgt. Clifton testified that he collected the items from the crime scene, that he placed them in an envelope, and that he put his initials on the envelope. He said that the items were in substantially the same condition as when he collected them. London Pearce, a drug chemist with the Alabama Department of Forensic Sciences, testified that he received the envelope and signed for it, that he placed a yellow evidence label on the three evidence bags that were in the envelope, and that the items were in substantially the same condition as when he received them in the lab. Pearce conducted the analysis on the pills that were in the bags.
Regarding the chain of custody for the crack pipe § 12-21-13, Ala. Code 1975, provides:
“Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration *214 by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence.”
When the authenticity of an item is “established by other means, it [is] not necessary to establish a chain of custody.” Ex parte Works, 640 So.2d 1056, 1059 (Ala.1994).
Sgt. Clifton identified the crack pipe as the pipe that he collected from the crime scene. Thus, according to § 12-21-13, Ala.Code 1975, the crack pipe was correctly received into evidence. Also, it appears that the pills that were seized from the apartment were collected and sealed, sent to the lab, and received at the lab in the same condition. Thus, the pills were also correctly received into evidence. For the foregoing reasons we find no reversible error in regard to this claim.
XVI.
Boyle next argues that the prosecutor’s closing argument in the guilt phase improperly shifted the burden of proof to him and constituted reversible error.
Boyle failed to object to the now-challenged argument at the time the argument was made; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P. When discussing the failure to object to an alleged improper argument, this Court has stated:
“ ‘While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.’ Ex parte Kennedy, 472 So.2d [1106,] at 1111 [(Ala.1985)]_ ‘This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.’ Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).”
Kuenzel v. State, 577 So.2d 474, 489 (Ala. Crim.App.1990).
In reviewing the validity of a prosecutor’s argument, we keep in mind the following:
“ ‘The prosecutor’s duty in a criminal prosecution is to seek justice, and although the prosecutor should prosecute with vigor, he or she should not use improper methods calculated to produce a wrongful conviction.’ Smith v. State, [Ms. CR-97-1258, December 22, 2000] - So.2d -, - (Ala.Crim.App. 2000), aff'd in pertinent part, rev’d on other grounds, [Ms. 1010267, March 14, 2003] — So.2d - (Ala.2003). ‘In reviewing allegedly improper prosecuto-rial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.’ Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev’d on other grounds, 625 So.2d 1146 (Ala.1993). ‘ “Prosecutorial misconduct is a basis for reversing an appellant’s conviction only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused.” ’ Carroll v. State, 599 So.2d 1253, 1268 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 *215 (Ala.1993), quoting United States v. Reed, 887 F.2d 1898, 1402 (11th Cir. 1989). The relevant question is whether the prosecutor’s conduct ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).”
Minor v. State, 914 So.2d 372, 415 (Ala. Crim.App.2004).
Boyle challenges the following argument made by the prosecutor in his closing argument in the guilt phase:
“You also have heard that once this child was at the hospital, there was one thing primarily on Timothy Boyle’s mind, and that was trying to get somebody to get back to that apartment to hide the drugs.
“He called Kim Parr four or five times. ‘Get those drugs. Get up there. What’s going on at my house? If you love these babies, then you’ll do this for me.’
“It was more important to him that those drugs be gotten out of the house than for him to know what happened to Savannah. That’s because he knew exactly what happened to Savannah, ladies and gentlemen.

“There is no evidence, none, from anywhere that anyone, other than this defendant, ever did anything to harm this child. There is no evidence that anybody else hit this child in the head, caused her to hit her head against anything, burned her with cigarettes, slapped her in the face, made her throw up. None.”

(R. 2129-30) (emphasis added).
The prosecutor was commenting on the strength of the State’s case. “There is no suggestion from the above-quoted argument that [the appellant] had an obligation to produce any evidence or to prove his innocence.” Broadnax v. State, 825 So.2d 134,185 (Ala.Crim.App.2000).
“[T]he prosecutor’s statements regarding the lack of testimony ... were permissible. Rather than shifting the bur: den of proof, these statements constitute an effort to meet the prosecutor’s own burden of proof by commenting on the lack of evidence. It is permissible for the prosecutor to ask the jury to draw inferences from the lack of evidence as well as from the evidence presented. Davis v. State, 290 Ala. 364, 365, 274 So.2d 363 (1973).”
Miles v. State, 715 So.2d 913, 917 (Ala. Crim.App.1997). “Our interpretation of the argument in question leads us to conclude that the prosecution was not attempting to shift the burden of proof, but was merely making the point that the State’s case had not been undermined.” Speigner v. State, 369 So.2d 39, 44 (Ala. Crim.App.1979). A prosecutor may comment in closing on the strength of the State’s case. McWhorter v. State, 781 So.2d 257, 321 (Ala.Crim.App.1999).
Accordingly, wee find no error, much less plain error, in the above argument made by the prosecutor.
XVII.
Boyle next challenges several of the circuit court’s jury’s instructions in the guilt phase.
“A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, ‘ “the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.’” Self v. State, 620 So.2d 110, 113 (Ala.Cr. App.1992) (quoting Porter v. State, 520 *216 So.2d 235, 237 (Ala.Cr.App.1987)); see also Beard v. State, 612 So.2d 1335 (Ala. Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).”
Williams v. State, 795 So.2d 753, 780 (Ala. Crim.App.1999). “‘“The language of a charge must be given a reasonable construction, and not a strained and unreasonable one.” ’ Harris v. State, 394 So.2d 96, 100 (Ala.Cr.App.1981).” Kennedy v. State, 472 So.2d 1092, 1103 (Ala.Crim.App.1984). Last, “The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the defendant’s failure to object does weigh against his claim of prejudice.” Ex parte Boyd, 715 So.2d 852, 855 (Ala.1998).
With these principles in mind we review the challenged jury instructions raised by Boyle in this brief to this Court.
A.
First, Boyle argues that the circuit court’s instructions on intent were erroneous because, he says, the instruction allowed the jury to convict Boyle if it believed that Boyle intended to engage in certain conduct but did not have the intent to kill.
The circuit court gave the following instruction on intent:
“Intent, being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof and must usually be inferred from the facts testified to by the witnesses and the circumstances as developed by the evidence.
“Intent must be specific and real in a capital murder case. The defendant must act intentionally as opposed to negligently, accidently or recklessly to cause the death of the deceased in order to convict the defendant of guilty of capital murder.
“You act intentionally with respect to a result or conduct when you have the purpose to cause that result or to engage in that conduct. Intent is to be determined by the surrounding attendant circumstances and by the actions, if any, of the defendant.”
(R. 2200-01.)
During deliberations, the jury requested that the court either give them a copy of the law or repeat its instruction on “intent.” A lengthy discussion ensued (R. 2229-2248), after which both the prosecution and defense counsel agreed on the contents of the instruction the circuit court would repeat to the jury. The court then instructed:
“A person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his purpose is to cause that result or to engage in that conduct. Intent is to be determined by the surrounding attendant circumstances and by the actions, if any, of the defendant.”
(R. 2248.) The circuit court then, asked if the attorneys were satisfied; both indicated that they were. (R. 2248.)
During the charge conference, when the circuit court said that it intended to read the definition of “intentional” contained in § 13A-2-2(l), Ala.Code 1975, Boyle had no objection. (R.2076.) Also, at the conclusion of the jury instructions, the circuit court specifically asked if the attorneys had any objections, and defense counsel stated that he had no objections. (R. 2216.) Accordingly, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
Boyle specifically argues that the circuit court’s instruction that “you act intentionally with respect to a result or conduct when you have the purpose to cause that result or to engage in that conduct” *217 allowed the jury to convict without finding the specific intent to kill. This portion of the court’s instruction is identical to the statutory definition of “intentional” contained in § 18A-2-2, Ala.Code 195. Section 13A-2-2(l), Ala.Code 1975, states: “A person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause that result or to engage in that conduct.”
The Alabama Supreme Court, in addressing a circuit court’s use of a jury charge in a capital-murder case that contained the exact definition of “intentional” contained in § 13A-2-2(l), stated:
“The trial court, in defining mental culpability, read Code 1975, § 13A-2-2, to the jury verbatim, thereby defining each mental state along the spectrum from ‘intentional’ to ‘criminal negligence.’ Each definition was relevant to the various verdict options except ‘criminal negligence.’ The definition of ‘intentionally’ was relevant to the court’s instructions on the ‘intent to kill’ element of the capital offense.”
^Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala.1985).
This Court may find plain error in a jury instruction only if “there is a reasonable likelihood that the jury applied the instruction in an improper manner.” Williams v. State, 710 So.2d 1276, 1306 (Ala.Crim.App.1996). See also Pilley v. State, 789 So.2d 870, 882-83 (Ala.Crim. App.1998). The jury was instructed that in order to convict Boyle of capital murder the jury had to find that Boyle had the specific intent to kill. There is no reasonable likelihood that the jurors applied the challenged instruction in an improper manner. There was no plain error in the circuit court’s instructions on intent.
B.
Boyle argues that the circuit court’s jury instructions on reasonable doubt violated the United States Supreme Court’s decision in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), because, he argues, the charge allowed the jury to convict him on a lesser degree of proof than is required by law.
The circuit court gave the following charge on reasonable doubt:
“The term ‘reasonable doubt’ means a doubt which has some good reason for it, arising out of the evidence or lack of evidence in the case. Such a doubt as you are able to find in the evidence a reason for. It means an actual and substantial doubt, growing out of the unsatisfactory nature of the evidence. It does not mean a doubt which arises from some mere whim or from any groundless surmise or guess.
[[Image here]]
“So, ladies and gentlemen, by reasonable. doubt is not meant absolute certainty. There is no such thing as absolute certainty in human affairs....
“Ladies and gentlemen of the jury, the Court charges you the burden of proof is upon the State and it is the duty of the State to show beyond a reasonable doubt to the exclusion of every other reasonable hypothesis and circumstance to show the defendant is guilty. And unless the State has done that in this case, it is your duty to render a verdict of not guilty.”
(R. 2203-04.) After the circuit court completed its jury instructions, Boyle stated that he had no objection. Accordingly, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
In Cage v. Louisiana, the United States Supreme Court held that use of the terms “grave uncertainty, actual substantial *218 doubt, and moral certainty” when defining reasonable doubt allowed a juror to find guilt “based on a degree of proof below that required by the Due Process Clause.” 498 U.S. at 41. “[I]t was not the use of any one of these terms, but rather the combination of all three, that rendered the charge unconstitutional in Cage.” Haney v. State, 603 So.2d 368, 411 (Ala.Crim.App. 1991). In discussing the evolution of the law subsequent Cage, the Alabama Supreme Court has stated:
“In Estelle v. McGuire, 502 U.S. 62, 72 and n. 4, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), the United States Supreme Court made clear that the proper inquiry was whether there is a reasonable likelihood that the jury did apply the instruction in an unconstitutional manner, not whether it could have applied it in an unconstitutional manner. In Vitor [v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) ], the United States Supreme Court emphasized that ‘[t]he constitutional question ... is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the Winship standard.’ 511 U.S. at 6. In discussing one of the jury instructions challenged in Victor, the United States Supreme Court recognized that it had stated that ‘ “[pjroof to a ‘moral certainty is an equivalent phrase with ‘beyond a reasonable doubt.’” Fidelity Mut. Life Ass’n v. Mettler, 185 U.S. 308, 317, 22 S.Ct. 662, 46 L.Ed. 922 (1902) (approving reasonable doubt instruction cast in terms of moral certainty).’ 511 U.S. at 12. The United States Supreme Court acknowledged that historically the phrase ‘moral certainty in a jury instruction meant ‘the highest degree of certitude based on [the] evidence’ but that the term may have lost its historical meaning over time. 511 U.S. at 11. The United States Supreme Court, however, concluded that when an instruction equated moral certainty with proof beyond a reasonable doubt the instruction satisfied the requirements of the Due Process Clause and was constitutionally sufficient. The United States Supreme Court emphasized that, although it did not condone the use of the phrase ‘moral certainty,’ if the jury was instructed that its decision was to be based on the evidence in the case, then the jury understood that moral certainty was associated with the evidence of the case and no constitutional error occurred. Additionally, the United States Supreme Court addressed the use of the phrase ‘substantial doubt’ and emphasized that when that phrase was used in context to convey the existence rather than the magnitude of doubt there was no likelihood that jury applied the charge unconstitutionally.”
Ex parte Brown, 74 So.3d 1039, 1052-53 (Ala. 2011). “Use of some but not all of the terminology found offensive in Cage does not automatically constitute reversible error.” Dobyne v. State, 672 So.2d 1319,1343 (Ala.Crim.App.1994).
The circuit court’s instruction on reasonable doubt did not combine the three phrases the United States Supreme Court found offensive in Cape v. Louisiana and could not reasonably be interpreted to lessen the State’s burden of proof. Accordingly, we find no plain error in regard to this claim.
C.
Boyle next argues that the circuit court’s instructions concerning the possession charge were erroneous. Specifically, Boyle argues that the circuit court’s' instruction allowed the jury to convict Boyle of possession if he had knowledge of the presence of the illegal drugs.
*219 During the charge conference, the following occurred:
“[Defense counsel]: Judge, with respect to the possession charge, did you also include the constructive possession definition?
“The Court: Yeah, let’s talk about that. I’ve got a case on that.
‘“Where actual possession cannot be proven, constructive possession can be relied upon if the prosecution proves beyond a reasonable doubt that the defendant had knowledge of the presence of the prohibited substance. Such knowledge may be proven by circumstantial evidence.’
“[Prosecutor]: Sounds good yeah.
“The Court: That’s the case of Coleman v. State [, 394 So.2d 82 (Ala.Crim.App. 1981) ].
“[Defense counsel]: That’s acceptable, Judge. I understand that’s what the. statement of the law is.”
(R.2079.)
Not only did Boyle not object to the circuit court’s instruction on constructive possession, but defense counsel indicated that the instruction was acceptable. Because this argument concerns his conviction for a noncapital offense and Boyle did not object to this instruction, this claim is not properly before this Court. See Ex parte Woodall, supra.
XVIII.
Boyle next argues that there was a fatal variance between the indictment and the proof at trial because, he says, the indictment charged that the victim died of blunt-force injuries but, he says, the State proved at trial that the victim died from being beaten with “an open hand on and around her head.” In his brief to this Court, Boyle asserts that “the prosecution presented proof of the same crime under a different set of facts as those alleged in the indictment, thus creating a fatal variance between the indictment and the proof at trial.” (Boyle’s brief, at p. 86.)
Boyle moved for a judgment of acquittal and argued that there was a variance between the charges in the indictment and the proof that the State had presented at trial. (R. 1837.) In Boyle’s written motion, he stated:
“The indictment in this case alleges that [Boyle] intentionally murdered [Savannah] ‘by striking her head against a blunt object and/or causing her head to strike a blunt object....’
“That the impression one forms from the. language in the indictment is a picture of the child’s head being forced or rammed into a blunt object. The testimony at trial from the one witness who claims to have seen the incident has been that [Boyle] ‘slapped and beat the child upon the face and head.’ ”
(C.R.132.) The prosecutor countered Boyle’s argument by stating:
“Judge, part of the proof in this case is that there was a bathtub incident. Part of the proof .also is that there was — there were blows inflicted with an open hand, or with his hand. So, I mean, one doesn’t necessarily exclude the other.
“You know, we’re not responsible for what the defense believes or what they understand or what their impressions may be. You know, we have evidence in this case. The evidence was available. If they only looked at [H.D.’s] videotape at The Barrie Center [for Children], It talks about all the proof we’ve put in.
“They’re completely on notice of what our allegations have been from the beginning. There was a bathtub incident. We’re not backing off on that. And that *220 bathtub incident probably very well contributed to her death as well.
“And there was also a beating incident, or more than one beating incident; a number of beating incidents over a period of probably at least several weeks where this child’s head was injured or brain was injured to the point it finally killed her.”
(R. 1843-44.) The circuit court stated that Boyle had access to the autopsy report and the photographic evidence; thus, it said, Boyle had to have knowledge of the severity of the victim’s injuries. The circuit court denied Boyle’s motion for a judgment of acquittal. (R. 1864.)
The indictment charged that Boyle “did intentionally cause the death of another person, to wit: Savannah White, who was less than fourteen years of age, by striking her head against a blunt object and/or causing her head to strike a blunt object, in violation of the provisions of Title 13A, § 13A-5-40(a)(15), Code of Alabama 1975 contrary to the law and against the peace and dignity of the State of Alabama.”
(C.R.17.)
“One of the functions of an indictment is to adequately inform the accused of the crime charged so that a defense may be prepared. Ex parte Washington, 448 So.2d 404, 407 (Ala.1984). A variance in the form of the offense charged in the indictment and the proof presented at trial is fatal if the proof offered by the State is of a different crime, or of the same crime, but- under a set of facts different from those set out in the indictment. Ex parte Hightower, 443 So.2d 1272, 1274 (Ala.1983).”
Ex parte Hamm, 564 So.2d 469, 471 (Ala. 1990).
“A fatal variance exist[s] only where the State fails to adduce any proof of a material allegation of the indictment or where the only proof adduced is contrary to a material allegation in the indictment.” Johnson v. State, 584 So.2d 881, 884 (Ala.Crim.App.1991).
“ ‘The policy behind the variance rule is that the accused should have sufficient notice to enable him to defend himself at trial on the crime for which he has been indicted and proof of a different crime or the same crime under a different set of facts deprives him of that notice to which he is constitutionally entitled.’ House [v. State ], 380 So.2d [940] at 942 [ (Ala.Crim.App.1989) ]. ‘Not every variance is fatal. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Reviewing a claim of variance requires use of a two step analysis: (1) was there in fact a variance between the indictment and proof, and (2) was the variance prejudicial.’ United States v. McCrary, 699 F.2d 1308, 1310 (11th Cir. 1983). ‘The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such a variance as to “affect the substantial rights” of the accused.’ Berger, 295 U.S. at 82, 55 S.Ct. at 630. ‘Variance from the indictment is not always prejudicial nor is prejudice assumed.’ United States v. Womack, 654 F.2d 1034, 1041 (5th Cir.1981), cert. denied, 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 314 (1982). The determination of whether a variance affects the defense will have to be made based upon the facts of each case. United States v. Pearson, 667 F.2d 12, 15 (5th Cir.1982).”
Smith v. State, 551 So.2d 1161, 1168-69 (Ala.Crim.App.1989).
When discussing variances in an indictment as they relate to the manner of death this Court in Thompson v. State, 542 So.2d 1286 (Ala.Crim.App.1988), stated:
*221 ‘“The great particularity required by the common law in setting forth the manner of death and the means or instrument by which it was inflicted frequently has resulted in miscarriage of justice due to variances between allegations and proof.’ 26 Am.Jur. Homicide § 266. ‘[MJodern tendencies, as manifested by both legislative and judicial action, are toward a relaxation of the technicalities of the earlier rules.’ 40 Am.Jur.2d Homicide § 229. ‘The law does not require precise conformity in every particular where the weapon is alleged but rather substantial proof of the means by which the offense was committed. Matthews v. State, 51 Ala. App. 417, 286 So.2d 91 (1973); Threatt v. State, 32 Ala.App. 416, 26 So.2d 530 (1946).’ Trest v. State, 409 So.2d 906, 909 (Ala.Cr.App.1981).
[[Image here]]
“ ‘Every constituent of murder was averred in the indictment under consideration and “it is sufficient, if the substance of the charge be proved, without regard to the precise instrument used. Though the indictment charges a particular weapon, the averment is substantially proved, if it be shown that some other instrument was employed, which occasions a wound of the same kind as the instrument charged, and the same consequences naturally follow.” Hull v. State, 79 Ala. 32, 33 [ (Ala.1885) ].’
“Wesson v. State, 251 Ala. 33, 34, 36 So.2d 361, 362 (Ala.1948). See Farris v. State, 432 So.2d 538, 541 (Ala.Cr.App. 1983) (no material variance between the indictment describing a glass bottle and proof showing a plastic bottle); Stevenson v. State, 404 So.2d 111, 113 (Ala.Cr. App.1981), cert. quashed, 404 So.2d 114 (Ala.1981) (no material variance where indictment charged killing with a pistol and the State proved killing with a shotgun, because the weapons inflict the same type of injury); Weaver v. State, 407 So.2d 568, 569 (Ala.Cr.App.1981) (no variance where the indictment charged killing with a rifle but the proof showed killing with a pistol, because they ‘both inflict the same character of wound’); Trammell v. State, 298 So.2d 666, 668 (Ala.Cr.App.1974) (no material variance where indictment charged killing with a bayonet but testimony showed killing with a knife). See also Arnold v. State, 686 S.W.2d 291, 293-94 (Tex.Dist.Ct. App.1985), affirmed, 742 S.W.2d 10 (Tex. Cr.App.1987) (no variance where indictment charged murder by stabbing or firearm and medical examiner testified that the fatal wound was inflicted by ‘cutting’); Phifer v. State, 651 S.W.2d 774, 781-82 (Tex.Cr.App.1983) (no variance where indictment alleged ‘choking’ but the medical examiner testified that the victim was not ‘choked’ in the medical sensé of cutting off the air supply to the lungs, rather death was from asphyxiation by ‘strangulation,’ which the examiner defined as cutting off the blood flow to or from the brain).
[[Image here]]
“ ‘It would be dealing in abstruse legal metaphysics, amounting almost to an absurdity, to hold that one guilty of a crime, such as indicated in the opinion of the Court of Appeals, should go free because the State was unable to prove that life was extinct before the deceased was stomped or because the State was unable to establish that the beating with the fists or the stomping with feet, one or the other or both, was the cause of death. The essence of the charge was proven when either of the means, substantially similar in nature, was shown to have produced the result.’
*222 “Wesson v. State, supra, 251 Ala. [33] at 35, 36 So.2d [361] at 363 [ (Ala.1948) ].”
542 So.2d at 1292-93. See also Rodgers v. State, 50 Ala. 102 (1874). “An averment in an indictment charging the use of a particular weapon is substantially proved by evidence that some other instrument was employed that causes a wound of the same kind as the instrument charged and the same consequences naturally follow.” 42 C.J.S. Indictments § 286 (2013). “If an indictment alleges the means by which an offense is committed, it must be substantially, though not literally, proven as alleged.” Huckabee v. State, 159 Ala. 45, 48 So. 796, 797-98 (1909).
Many courts have .observed that a hand may be a blunt-force instrument. See Cunningham v. Conway, 717 F.Supp.2d 339, 348 (W.D.N.Y.2010) (“[The victim’s] external examination revealed a laceration behind her right ear with internal hemorrhaging which he attributed to being hit with a hand or blunt object.”); Sanders v. State, 251 Ga. 70, 72, 303 S.E.2d 13, 15-16 (1983) (“Some of the bruises were lined up as if caused by a blunt instrument with several projections, which would have been consistent with the child having been struck by the knuckles of a hand.”); State v. Smith, 61 N.C.App. 52, 54, 300 S.E.2d 403, 405 (1983) (“The medical examiner testified that there were bruises on [the victim’s] body and that it was his opinion that the cause of death was three sharp blows to her head from a blunt instrument such as a hand.”); Commonwealth v. Kane, 388 Mass. 128, 134, 445 N.E.2d 598, 602 (1983) (“[D]eath was caused by very severe blows of a blunt instrument such as a fist, a foot, or a board.”); Jones v. State, 580 P.2d 1150, 1152 (Wyo.1978) (“[T]he child had three bruises on her head which could have been caused by a hand or other blunt instrument....”); Haas v. State, 498 S.W.2d 206, 208 (Tex.Crim.App.1973) (“The woman died due to severe blows to her head caused by either a blunt instrument or the fist and heels of her assailants.”); People v. Berles, 30 Mich.App. 716, 722, 186 N.W.2d 852, 855 (1971) (“Such evidence, if believed, would tie defendant to the injuries which medical experts had indicated to be inflicted by a blow delivered by a blunt instrument such as a hand.”).
The indictment charged that Boyle caused the death of Savannah by striking her head with a blunt-force object or causing her head to strike a blunt-force object. The State proved that Savannah died from blunt-force trauma to her head and that Boyle struck Savannah and caused her head to strike a wall — a blunt object. “The proof was sufficient to support the offense charged in the indictment.” Johnson v. State, 584 So.2d 881, 884 (Ala.Crim.App.1991). There was no fatal variance between the indictment and the State’s proof at trial. Accordingly, we find no error in regard to this claim.
XIX.
Boyle next argues that there was not sufficient evidence to convict him of capital murder because, he says, there was no evidence indicating that he intended to kill Savannah. Specifically, he argues that there was evidence only that the victim had been slapped, that slapping is “a widely used and socially accepted form of child discipline,” and that Boyle took her to the hospital — all evidence, he says, indicating his lack of intent to kill.
Boyle moved for a judgment of acquittal on the basis that the evidence was insufficient to convict him. (R. 1840-60.) Boyle also filed a motion for a new trial, arguing that the evidence was not sufficient to prove his guilt beyond a reasonable doubt. (C.R.185.). Both motions were denied.
*223 This Court has stated the following concerning proof of the element of intent:
“[B]ecause intent is a state of mind, it is rarely susceptible of direct or positive proof. Instead, the element of intent must usually be inferred from the facts testified to by the witnesses together with the circumstances as developed by the evidence. Seaton v. State, 645 So.2d 841, 343 (Ala.Crim.App.1994) (quoting McCord v. State, 501 So.2d 520, 528-29 (Ala.Crim.App.1986)). Intent ‘ “ ‘may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.’ ” ’ Farrior v. State, 728 So.2d 691, 695 (Ala. Crim.App.1998) (quoting Jones v. State, 591 So.2d 569, 574 (Ala.Crim.App.1991), quoting, in turn, Johnson v. State, 390 So.2d 1160, 1167 (Ala.Crim.App.1980)). Finally, ‘ “[t]he intent of a defendant at the time of the offense is a jury question.” ’ C.G. v. State, 841 So.2d 281, 291 (Ala.Crim.App.2001), aff'd, 841 So.2d 292 (Ala.2002), quoting Downing v. State, 620 So.2d 983, 985 (Ala.Crim.App.1993).”
Pilley v. State, 930 So.2d 550, 564-65 (Ala. Crim.App.2005).
The Indiana Supreme Court in Gibson v. State, 515 N.E.2d 492 (Ind.1987), when discussing the element of intent in the beating death of a two-year-old child, aptly stated:
“The duration, brutality, and relative strengths of the defendant and victim are factors that can be considered by the jury as indications of the defendant’s intent to kill. Johansen [v. State ], 499 N.E.2d [1128] at 1132 [ (Ind.1986) ]. The evidence, particularly Gibson’s statement to the police on January 25, 1985, shows Gibson had hit and kicked Jolie numerous times prior to her hospitalization. The injuries left bruises on Jolie’s head and face. Eventually, Gibson’s conduct left Jolie’s eyes terribly discolored and nearly swollen shut. Moreover, the victim was a small two year old girl. Gibson was a thirty year old male. The evidence shows Gibson hit and kicked the child when he was angry -with her, particularly when he was frustrated with the child’s crying. The jury could reasonably infer that whenever Gibson struck the child he did so intentionally. Moreover, considering the obvious previous injuries to the child and that the injuries sustained by the child were serious enough to leave bruises and to require emergency surgery to save her life, the jury could reasonably infer Gibson was aware that the force he used to hit the child was sufficient to cause serious injury. Considering the disparity in size and age between Gibson and the victim, that the victim was in Gibson’s care and was not a threat to Gibson, and that Gibson had struck Jolie before resulting in obvious injuries to the child, Gibson’s continued infliction of injuries on the child evinces a conscious intent to seriously harm the victim.”
515 N.E.2d at 496-97. See also Anderson v. State, 681 N.E.2d 703, 708 (Ind.1997) (“Marie was a 21-month old child. Defendant was a grown man. It would be reasonable for a jury to conclude that defendant was aware of a high probability that hitting a small child across the chest would result in her death.”).
“The severity of defendants’ actions certainly gave them knowledge of the probability of death or great bodily harm, sufficient to constitute murder. The intent to kill may be inferred by the vicious character of an assault. See People v. Allum (1967), 78 Ill.App.2d 462, 223 N.E.2d 187, citing People v. Winters (1963), 29 Ill.2d 74, 193 N.E.2d 809.”
People v. Carter, 168 Ill.App.3d 237, 248-49, 118 Ill.Dec. 983, 522 N.E.2d 653, 660 (1988).
*224 Here, Dr. Lauridson testified concerning the nature and extent of Savannah’s injuries. He said that Savannah had bruises on her neck and shoulder and that she had a hemorrhage in one eye, bruises above her right ear, an abrasion on her left earlobe, bruises on the back of her head, “a great deal of hemorrhage” under the scalp and between the scalp and skull, injuries around the entire “circumference of her skull under her hairline, and extensive swelling to her brain. Also, on the back of her left hand and her right foot she had burns, which the coroner said were consistent with cigarette burns, and she had bruises on the insides of both her thighs. It was Dr. Lauridson’s opinion that Savannah died as a result of brain swelling caused by numerous and repeated blunt-force blows to her head. (R. 1766.) Some of the injuries, he said, were in various stages of healing and had been inflicted before the injuries that resulted in her death. The injuries, he said, were not caused by one blow but were caused by repeated blows to the head and were consistent with having been made by a open hand with great force. (R. 1767.)
Boyle was a grown man — the victim a small defenseless two-year-old child. There was sufficient evidence presented from which the jury could conclude that Boyle had the specific intent to kill Savannah based on the nature and extent of the injuries inflicted on her before her death.
XX.
Boyle next argues that the jury foreman, K.B., failed to disclose during voir dire that he knew Savannah’s mother and that this failure deprived him of his constitutional right to be tried by an impartial jury.
The record reflects that Boyle filed a pro se motion for a new trial arguing, in part, that K.B. failed to disclose during voir dire that he had known Savannah’s mother and had counseled her in the program Community Intensive Treatment for Youth (“C.I.T.Y.”). He asserted that the failure to disclose this information resulted in prejudice to him. (C.R.149.) An extensive hearing was held on the motion, at which time C.I.T.Y. records were admitted and juror K.B. testified. (C.R.2728-99.) The circuit court issued a detailed order denying the motion. The order stated, in part:
“The Court heard testimony from the juror identified as K.B. K.B. testified that he never realized during voir dire the juror questionnaire and jury selection process that he was at one time acquainted with any person involved in the facts before the case at bar. He stated that during the testimony of Claude Burk, Melissa Burk White’s father, the name Burk sounded familiar.
“Then upon seeing Melissa White in the background of a scene on a DVD while the jury was reviewing evidence during the deliberation process, he remembered that he had been a counsel- or/teacher of Melissa White, then Melissa Burk, in his position with the C.I.T.Y. Program nearly a decade earlier.
“K.B. testified that once he realized this, he did not share this information with any other juror, and it played absolutely no part in his deliberations in this matter.
[[Image here]]
“A review of the voir dire of K.B., discussed at length on the record in the hearings on this matter, reveals there is no indication he deliberately answered any question untruthfully, nor that he demonstrated a willfulness to intentionally provide inaccurate information. The oral questions during voir dire referred to Melissa White, not Melissa Burk. At no point during the trial itself *225 was Melissa White referred to as Melissa Burke or even Melissa Burke White in the presence of the jury.
[[Image here]]
“It is critical to point out that Melissa White was neither a party nor even a witness in this action. At no time did she appear in Court while the jury was present. The juror was never presented with an opportunity to apply any temporally remote knowledge he may have of-her to the issues he was called upon to decide. Being a non-party, never appearing in Court before the jury, and not testifying, her credibility was never an issue before the jury.
[[Image here]]
“These circumstances simply do not lend themselves to any reasonable conclusion that probable prejudice against [Boyle] has been established by [Boyle].”
(C.R.159-60.)
K.B. said that during Claude Burk’s testimony he realized that the victim’s mother might have been a student he had counseled in the C.I.T.Y. program. KB. testified:
“It’s been almost eleven years since I’ve spoken or seen Melissa. That’s why it was such a hard time, you know, recalling anything about her. Because eleven years, that’s almost three hundred and fifty students I’ve seen between her and now.”
(R. 2735.) He stated that he recognized Melissa’s face from a videotape that was shown during Claude Burk’s testimony but that he did not remember anything about her background until the day before the hearing on Boyle’s motion for a new trial. (R. 2737.) KB. further testified that his previous contact with Melissa had no impact on his decision in this case. (R. 2750.)
“[T]he failure of a juror to make a proper response to a question regarding his qualifications to serve as a juror, regardless of the situation or circumstances, does not automatically entitle one to a new trial.” Radney v. State, 342 So.2d 942, 946 (Ala.Crim.App.1976).
“[T]he proper standard to apply in determining whether a party is entitled to a new trial in this circumstance is ‘whether the defendant might have been prejudiced by a veniremember’s failure to make a proper response.’ Ex parte Stewart, 659 So.2d [122] at 124 [ (Ala. 1993) ]. Further, the determination of whether a party might have been prejudiced, i.e., whether there was probable prejudice, is a matter within the trial court’s discretion. Eaton v. Horton, 565 So.2d 183 (Ala.1990); Land & Assocs., Inc. v. Simmons, 562 So.2d 140 (Ala. 1989) (Houston, J., concurring specially)-”
Ex parte Dobyne, 805 So.2d 763, 771-72 (Ala.2001).
In discussing the “might have been prejudiced” standard, the Alabama Supreme Court in Ex parte Apicella, 809 So.2d 865 (Ala.2001), stated:
“Apicella argues that when a court is determining whether a juror’s conduct has caused actual prejudice the standard applied is whether the extraneous material ‘might have influenced that juror and others with whom he deliberated,’ Roan v. State, 225 Ala. 428, 435, 143 So. 454, 460 (1932). Apicella relies heavily upon this statement in Roan:
“ ‘The test of vitiating influence is not that it did influence a member of the jury to act without the evidence, but that it might have unlawfully influenced that juror and others with whom he deliberated, and might have unlawfully influenced its verdict rendered.’
*226 “225 Ala. at 435,143 So. at 460.
“On its face, this standard would require nothing more than that the defendant establish that juror misconduct occurred. As Apicella argues, the word ‘might’ encompasses the entire realm of possibility and the court cannot rule out all possible scenarios in which the jury’s verdict might have been affected.
“However, as other Alabama cases establish, more is required of the defendant. In Reed v. State, 547 So.2d 596, 598 (Ala.1989), this Court addressed a similar case of juror misconduct:
“ ‘We begin by noting that no single fact or circumstance will determine whether the verdict rendered in a given case might have been unlawfully influenced by a juror’s [misconduct]. Rather, it is a case’s own peculiar set of circumstances that will decide the issue. In this case, it is undisputed that the juror told none of the other members of the jury of her experiment until after the verdict had been reached. While the question of whether she might have been unlawfully influenced by the experiment still remains, the juror testified at the post-trial hearing on the defendant’s motion for a new trial that her vote had not been affected by the [misconduct].’
“It is clear, then, that the question whether the jury’s decision might have been affected is answered not by a bare showing of juror misconduct, but rather by an examination of the circumstances particular to the case.”
809 So.2d at 870-71.
“Although the factors upon which the trial court’s determination of prejudice is made must necessarily vary from case to case, some of the factors which other courts have considered pertinent are: temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror’s inadvertence or willfulness in falsifying or failing to answer, the failure of the jurors to recollect, and the materiality of the matter inquired about.”
Freeman v. Hall, 286 Ala. 161, 167, 238 So.2d 330, 336 (1970).
Here, during voir dire the prospective jurors were asked only if they knew “Melissa White” and not “Melissa Burk.” The juror questionnaire does ask whether the jurors knew a “Melissa Burk White,” and K.B. indicated that he did not know Melissa Burk White. K.B. testified that he did not recognize this name and that he knew her as “Melissa Burk” and not “Melissa White.”
“All parties are entitled to truthful answers from prospective jurors on examination of the venire and concealment' of facts by silence by such a prospective juror denies the parties their right to advisedly exercise peremptory strikes, but it is permissible for a juror to remain silent until a question applies to him in a manner demanding a response.”
Thomas v. State, 338 So.2d 1045, 1047 (Ala.Crim.App.1976). We agree with the circuit court that nothing here suggests that K.B. deliberately withheld information during voir dire examination. “There is no evidence to justify a finding of concealment on the juror’s behalf.” Pugh v. State, 355 So.2d 386, 392 (Ala.Crim.App.1977).
This Court in Smithson v. State, 50 Ala. App. 318, 278 So.2d 766 (Ala.Crim.App. 1973), affirmed the circuit court’s denial of Smithson’s motion for a new trial after it was discovered that the jury foreman was related to the State’s main witness, and the juror had failed to disclose that fact during voir dire examination. This Court stated:
*227 “It is clear from the findings of the trial court that the witness Royer and the juror Royer were distantly related, and that neither was certain of their relationship. Further, they had not seen each other for several years and had never discussed the case at bar. It is also clear that the juror Royer did not recognize the witness Royer until he was actually seated in the witness stand, and this was why he did not respond at the time the question was asked, ‘Did he know.’ We are of the opinion that the finding by the trial judge in the case at bar properly applies the standard of Freeman v. Hall, [286 Ala. 161, 288 "So.2d 330 (1970) ], and that such finding is supported by the evidence in this cause. We therefore hold that there was no abuse of discretion by the trial court in denying appellant’s motion for new trial on the basis of the failure to answer on the part of the juror, Raymond T. Royer. Cooper v. Magic City Trucking Service, Inc., 288 Ala. 585, 264 So.2d 146 [(1972)]; Bruno’s Food Stores, Inc. v. Burnett, 288 Ala. 222, 259 So.2d 250 [(1972)]; Harris v. Whitehead, 46 Ala.App. 516, 244 So.2d 603 [ (1971) ]; Edwards v. State, 28 Ala.App. 409,186 So. 582 [ (1939) ].”
50 AlaApp. at 320,278 So.2d at 768.
In relation to the factors cited above, more than 10 years had passed since KB. had seen Melissa, K.B. was not asked during the oral voir dire if he knew “Melissa Burk ” but only “Melissa White,” and there is no indication that KB. deliberately withheld information. After carefully examining the record in this case, we find that the circuit court did not abuse its discretion in denying Boyle’s motion for a new trial based on KB. failure to respond to a question on voir dire examination.

Penalty-Phase Issues

XXI.
Boyle next argues that the State sought the death penalty in retaliation, he says, for his request for a continuance of his trial.
At a pretrial hearing, the State indicated that it knew of nothing at that time that would make this a death-eligible case. Later, the prosecutor indicated that after talking with the pathologist the State believed that it could prove one aggravating circumstance — that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. (R. 141.) In its formal notice of intent to seek the death penalty, the prosecutor stated:
• “Although this offense carries two possible punishments upon conviction, death or life without parole, counsel for the State previously informed defense counsel that the prosecution would not seek the death penalty in this case. The State’s position at that time was based upon the fact that there did not appear to be sufficient substantial evidence to support the applicability of any of the ‘aggravating circumstances’ enumerated in Alabama Code Section 13A-5-49. In the wake of extensive trial preparation in the case however, including detailed discussions with witnesses in the case over the past few weeks, prosecutors for the State have reached the conclusion that there is a good faith basis for the applicability of at least one of the aggravating circumstances set out in Ala.Code Section 13A-5-49. Under the facts and circumstances of the case at bar, the offense as committed appears to be ‘especially heinous, atrocious, or cruel compared to other capital offenses,’ as that provision has been defined in applicable caselaw. For that reason, the State has reconsidered its decision to rule out the possibility of seeking the death penalty *228 upon the conviction of the defendant for the charged offense, and to reserve the option of requesting the ultimate penalty in the event of a conviction.
[[Image here]]
“The State’s decision to reserve the option of requesting the death penalty upon the defendant’s conviction for capital murder is entirely unrelated to [Boyle’s] request for a continuance of his trial date or the Court’s granting of same. The decision is based solely upon the subsequent development of facts that support the grounds for imposition of the death penalty in this case, and the development of a good faith belief on the part of counsel that the interests of justice require the consideration of the death penalty in this case.”
(C.R.57.) Boyle did not argue in the circuit court that the prosecutor’s decision to seek the death penalty was vindictive. Accordingly, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
“In Hunt v. State, 642 So.2d 999 (Ala. Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994), we recognized the concept of vindictive prosecution. ‘ “A prosecutor’s use of the charging process may violate due process if it penalizes the exercise of constitutional or statutory rights.” ’ 642 So.2d at 1030, quoting Daniel F. Mclnnis et al., Project, Twenty-Second, Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1991-1992, 81 Geo. L.J. 853, 1029-35 (1993).”
Turner v. State, 924 So.2d 737, 751 (Ala. Crim.App.2002).
In discussing the difficulties of establishing a vindictive-prosecution claim related to a pretrial issue, one federal court has stated:
“ ‘In declining to apply a presumption of vindictiveness, the Court recognized that “additional” charges obtained by a prosecutor could not necessarily be characterized as an impermissible “penalty.” Since charges brought in an original indictment may be abandoned by the prosecutor in the course of plea negotiation — in often what is clearly a “benefit” to the defendant — changes in the charging decision that occur in the context of plea negotiation are an inaccurate measure of improper prosecutorial “vindictiveness.” An initial indictment — from which the prosecutor embarks on a course of plea negotiation — does not necessarily define' the extent of the legitimate interest in prosecution. For just as a prosecutor may forgo legitimate charges already brought in an effort to save the time and expense of trial, a prosecutor may file additional charges if an initial expectation that a defendant would plead guilty to lesser charges proves unfounded.’
“United States v. Goodwin, 457 U.S. 368, 378-80, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982) (footnotes omitted); see United States v. Napue, 834 F.2d 1311, 1330 (7th Cir.1987) (noting ‘that vindictive prosecution claims are less likely to be successful, and a presumption of vindictiveness is unwarranted, in a pretrial setting’ and ‘that the prosecutor must be allowed broad discretion in selecting the charges against the accused.’). ‘A defendant seeking to prove prosecutorial vindictiveness for a decision to indict must present objective evidence showing genuine vindictiveness.’ United States v. O’Hara, 301 F.3d 563, 571 (7th Cir. 2002).”
Quilling v. United States, 243 F.Supp.2d 872, 878 (S.D.Ill.2002).
There is nothing in the record that suggests vindictiveness on the part of the State in seeking the death penalty. Thus, *229 we find no plain error in regard to this claim.
XXII.
Boyle next argues that evolving standards of decency have rendered Alabama’s method of execution, lethal injection, unconstitutional.
Both the United States Supreme Court and the Alabama Supreme Court have addressed this issue. In Ex parte Belisle, 11 So.3d 323 (Ala.2008), the Alabama Supreme Court stated:
“The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze [v. Rees, 553 U.S. 35, 62,] 128 S.Ct. [1520] 1538 (2008) ], and noted that ‘[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.’ Baze, [553 U.S. at 61], 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that ‘Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.’ Baze, [553 U.S. at 114], 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana ‘provide a degree of assurance — missing from Kentucky’s protocol — that the first drug had been properly administered.’ Baze, [553 U.S. at 121], 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
“The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. ‘Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of “objectively intolerable risk of harm” that qualifies as cruel and unusual.’ Baze, [553 U.S. at 50], 128 S.Ct. at 1531. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.”
11 So.3d at 339. This Court is bound by the decisions of the Alabama Supreme Court. § 12-3-16, Ala.Code 1975. For the reasons stated in Ex parte Belisle, we find no merit to this claim.
XXIII.
Boyle next argues that the circuit court erred in allowing hearsay evidence to be admitted in the penalty phase. Specifically, Boyle argues that Tony Osborne, a football coach from Westbrook Christian School, should not have been allowed to testify concerning what Boyle’s house parents had written about him when Boyle lived at a group home while he was attending high school. He asserts that the admission of this evidence violated his constitutional right to due process and his right to confront his accusers.
During the penalty phase, Boyle called Osborne to testify. Osborne testified that he was the football coach at the .high school Boyle had attended and that he was also the disciplinary director, that Boyle was a member of the varsity team for one year, that, he did not know of any disciplinary problems caused by Boyle, that he was not aware of any disciplinary problems that had been reported by Boyle’s house parents, that Boyle was a good teammate and a hard worker, and that Boyle was a personable individual. On cross-examination, the State asked Boyle if he had talked to Boyle’s house *230 parents to see if they were having any problems with Boyle. The State then asked Osborne to read from “contact sheets,” or the group home’s method of reporting behavioral problems, that had been completed by Boyle’s house parents. The sheets contained information that Boyle had exposed himself while on a school bus, that Boyle and another boy had “smoked pot,” and that Boyle had helped steal a wallet. Boyle objected, arguing that the information contained on the contact sheets had no probative value and was too prejudicial. (R. 2445.) The circuit court allowed the evidence to be admitted.
Section 13A-5-45, Ala.Code 1975, governs the admission of evidence at the penalty phase of a capital-murder trial and states, in pertinent part:
“(c) At the sentence hearing evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to the aggravating and mitigating circumstances referred to in sections 13A-5-49, 13A-5-51 and 13A-5-52....
“(d) Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements .... ”
In Coral v. State, 628 So.2d 988 (Ala. Crim.App.1992), we stated:
“ ‘Courts are permitted to consider hearsay testimony at sentencing.... While hearsay evidence may be considered in sentencing, due process requires both that the defendant be given an opportunity to refute it and that it bear minimal indicia of reliability....’ Kuenzel v. State, 577 So.2d 474, 528 (Ala.Cr. App.1990), aff'd, 577 So.2d 531 (Ala. 1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991) (quoting United States v. Giltner, 889 F.2d 1004, 1007 (11th Cir.1989)). See also Smiley v. State, 435 So.2d 202 (Ala.Cr. App.1983).”
628 So.2d at 992. See Wuornos v. State, 644 So.2d 1012 (Fla.1994) (“Florida law provides that the usual rules of evidence are relaxed during the penalty phase and that hearsay evidence is permissible if a fair opportunity of rebuttal is permitted.”).
“[Tjhere is no Confrontation Clause violation because we agree with the Seventh Circuit that hearsay evidence is admissible at a capital sentencing. Del Vecchio v. Illinois Dep’t of Corrections, 31 F.3d 1363, 1387-88 (7th Cir.1994). This proposition does contain one caveat: that the state statute protect a defendant’s rights by giving him/her the opportunity to rebut any hearsay information. If the statute grants this protection, then it comports with the Sixth Améndment’s Confrontation Clause.”
Chandler v. Moore, 240 F.3d 907, 918 (11th Cir.2001).
In Gavin v. State, 891 So.2d 907 (Ala. Crim.App.2003), this Court addressed whether the circuit court had erred in allowing a document that contained hearsay to be admitted during the penalty phase of a capital-murder trial. In affirming the admission of the document against a claim that it was hearsay and that no proper predicate had been established, this Court stated:
“After reviewing the record, .we conclude that the ‘Official Statement of Facts’ was properly admitted under § 13A-5^15(d). The document had probative- value and was relevant to sentencing. As noted above, with respect to the prior conviction, the State pursued two aggravating circumstances— that Gavin was on parole at the time of *231 Clayton’s murder ánd that Gavin had previously been convicted of a capital offense or a felony involving the use or threat of violence to the person. The facts surrounding Gavin’s prior murder conviction were relevant and probative and properly admitted to show the violent nature of the prior offense. See Dill v. State, 600 So.2d 343, 364 (Ala. Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992) (holding that hearsay evidence of the circumstances surrounding the defendant’s prior robbery conviction ‘was properly admitted to show the violent nature of the offense’); Siebert v. State, 562 So.2d 586, 598 (Ala.Crim.App. 1989), affd, 562 So.2d 600 (Ala.1990) (holding that ‘testimony regarding the violence of the appellant’s prior manslaughter offense was relevant and of probative value in the sentencing aspect of the trial’); and Johnson v. State, 399 So.2d 859, 864 (Ala.Crim.App.1979), aff'd in pertinent part, rev’d on other grounds, 399 So.2d 873 (Ala.1979) (holding that hearsay evidence ‘[t]hat the defendant had been involved in a prior robbery where great violence had been perpetrated against the victim’ was properly admitted under § 13-11-3, Ala. Code 1975, the predecessor to § 13A-5-45(c) and (d), Ala.Code 1975, as probative and relevant to the sentencing determination).
“Moreover, we conclude, as did the trial court, that Gavin was provided a fair opportunity to rebut the facts in the document. Gavin stated at trial that he did not have access to the ‘official record’ from his previous conviction, but that he had ‘investigation only.’ (R. 1234.) We do not believe that Gavin’s not having the official record of his previous trial denied him a fair opportunity to rebut the facts of the document; his reference to ‘investigation only indicates that he had at least some information from the investigation of the prior murder. In addition, in addressing a similar claim regarding the opportunity to rebut hearsay evidence in Ex parte Dunaway, 746 So.2d 1042 (Ala.1999), four Justices on the Alabama Supreme Court noted that ‘[although he had a constitutional right not to do so, Dunaway, in an effort to rebut the [hearsay] testimony of the State’s witnesses ..., could have testified during the sentencing phase, as he chose to do during the guilt phase.’ 746 So.2d at 1048. Although Gavin did not testify at the guilt phase of his trial, as the appellant did in Ex parte Dunaway, he nevertheless could have testified at the sentencing phase in an effort to rebut the facts regarding the prior murder. Therefore, we find that Gavin was afforded a fair opportunity to rebut the facts in the document as required by § 13A-5-45(d).”
Gavin v. State, 891 So.2d 907, 953-54 (Ala. Crim.App.2003).
Here, the information contained on the contact sheets was relevant to rebut Osborne’s testimony of Boyle’s good character. Boyle had an opportunity to rebut the testimony. For the reasons stated in Gavin, we hold that the circuit court committed no error in allowing the hearsay testimony to be admitted during the penalty phase of Boyle’s trial.
.XXIV.
Boyle next argues that the prosecutor’s argument in the penalty phase was erroneous because, he says, it implied that the State had made a judgment that death was the appropriate punishment in this case.
The prosecutor made the following comments in closing at the penalty phase:
“Every one — every time the State or an individual is going to make a decision *232 as to whether or not someone — another human being should lose their life, it needs to be hard and it needs to be well thought out and it needs to be reasoned and it needs to be the right thing to do. That’s the bottom line. The right thing to do.
“And I’m sitting here thinking, or have been over the last week or so, especially since y’all’s first verdict, what right do I have to get up and ask for y’all to impose the death penalty on this young man sitting over here?
“Because it — you know, not only the State has all these stops and procedures and things to make sure we get it right, but we, individually — and this is what occurred to me: Each and every one of us; me, Marcus, Carol, folks in our office — and I now y’all; every good, decent, thinking human being with a conscience on the face of this earth would think hard and long before you would take another human life. There’s nothing good about it. Nothing. Got to.”
(R. 2636-87.)
Boyle did not object to the above argument; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P. “While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.” Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala. 1985).
' In a similar case, the prosecutor argued to the jury that the death penalty is not applied in every case, that each case was evaluated on its merits, and that the State had examined the egregiousness of the murders and the defendant’s backgrounds before deciding to seek the death penalty. In finding no error, the Florida Supreme Court stated:
“The focus of the prosecutor’s remarks was on the responsibility of the jury to weigh the relevant factors, and the prosecutor did not invoke a direct, unambiguous appeal for the jurors to give weight to the fact that the State had decided to seek the death penalty. In the portion of the comments for which the objection was overruled, the prosecutor’s statement that ‘[t]he death penalty is not applied to every murder case’ is reasonably understood as a reference to the legal framework governing imposition of the death penalty, rather than to the State’s determination whether to seek the death penalty. We thus conclude that the trial court did not abuse its discretion in overruling the objection to that portion of the argument.”
Braddy v. State, 111 So.3d 810, 848 (Fla. 2012). See also State v. Black, 50 S.W.3d 778, 792 (Mo.2001) (prosecutor’s argument that “ T realize the magnitude of the decision that you have to make, because I had to make it first,’ ” did not amount to plain error requiring reversal).
In Vanpelt v. State, 74 So.3d 32 (Ala. Crim.App.2009), we considered an argument the prosecutor made in the penalty phase of a capital-murder trial that his office did not lightly seek the death penalty. In finding no error, this Court stated:
“[T]he prosecutor’s comment that his office does not seek a death sentence lightly was not an improper request for the jury to ignore its penalty-phase duty. Instead, this comment merely reminded the jury of the gravity of its penalty-phase decision by informing the jury that in making its penalty phase decision it has an awesome responsibility — one that the State does not lightly ask a jury to shoulder. Cf. Fox v. Ward, 200 F.3d 1286, 1300 (10th Cir. 2000) (holding that a ‘proseeutorf’s] [comment to] the jury that he did not undertake the decision to seek the death penalty lightly, and pointed to the different elements that went into making his *233 decision[, was] a permissible line of commentary’).”
74 So.3d at 92.
Moreover, to constitute reversible error a prosecutor’s comment must have “so infected the trial with unfairness as to make the resulting [verdict] a denial of due process.” Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). That standard was not satisfied in this case. For the foregoing reasons, we find no plain error in the prosecutor’s argument.
XXV.
Boyle next raises several different arguments concerning the circuit court’s jury instructions in the penalty phase.
“A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, ‘“the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.” ’ Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App. 1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App. 1992).”
Williams v. State, 795 So.2d 753, 780 (Ala. Crim.App.1999).
“ ‘In setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that “an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.” Williams v. State, 710 So.2d 1276, 1306 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).’ ”
Broadnax v. State, 825 So.2d 134,196 (Ala. Crim.App.2000), quoting Pilley v. State, 789 So.2d 870, 882-83 (Ala.Crim.App.1998).
A.
First, Boyle argues that the circuit court’s instructions on the aggravating circumstance that the murder was especially heinous, atrocious, or cruel were erroneous. Specifically, he argues that the circuit court failed to instruct the jury that psychological torture had to be present for an appreciable period in order for the aggravating circumstance to apply.
The record reflects that at the charge conference the State requested an instruction on the length of time necessary to prove this aggravating circumstance. (R. 2375.) Boyle objected. (R. 2377.) The circuit court gave the following instruction on this aggravating circumstance:
“For a capital offense to be especially heinous or atrocious, any brutality that is involved in it must exceed that which is normally present in any capital offense.
“For a capital offense to be especially cruel, it must be a pitiless crime that is unnecessarily torturous to the victim, either physically or psychologically.
“All capital offenses are heinous, atrocious and cruel to some extent. What is intended to be covered by this aggravating circumstance is only those cases in which the degree of heinousness, atrociousness or cruelty exceeds that which will always exist when a capital offense is committed.
*234 “There are three factors generally recognized as indicating the capital offense is especially heinous, atrocious or cruel. One, the infliction on the victim of violence beyond that necessarily or sufficient to cause death.
“Two, appreciable suffering by the victim after the assault that resulted in the death.
“And three, infliction of psychological torture of the victim.
“Psychological torture can be inflicted when the victim is in intense fear and is aware of, but helpless to prevent, impending death. Such torture must have been present for an appreciable lapse of time sufficient to cause prolonged or appreciable suffering to be considered as an aggravating circumstance.
[[Image here]]
“Evidence as to the fear experienced by the victim before death is a significant factor in determining the existence of an aggravating circumstance that the murder was especially heinous, atrocious or cruel. This circumstance may be found, even though the victim lost consciousness or died with wounds inflicted within a few seconds or minutes or otherwise without a time lapse deemed significant.”
(R. 2680-82.) Boyle did not object to the above instruction at the conclusion of the circuit court’s oral charges to the jury. (R. 2699.) Thus, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
The Pattern Jury Instructions for Use in Capital Cases, as amended by the Alabama Supreme Court in November 2007, do not contain the detailed instructions on the aggravating circumstance the circuit court gave in this case. The pattern jury instructions recommend the following instruction:
“The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses;
“The term ‘heinous’ means extremely wicked or shockingly evil. The term ‘atrocious’ means outrageously wicked or violent. The term ‘cruel’ means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others.
“What is intended to be included in this aggravating circumstance is those cases where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital offenses.
“For a capital offense to be especially heinous or atrocious, any brutality that is involved in it must exceed that which is normally present in any capital offense.
“For a capital offense to be especially cruel, it must be a pitiless crime that is unnecessarily torturous to the victim, either physically or psychologically.
“All capital offenses are heinous, atrocious, and cruel to some extent. What is intended to be covered by this aggravating circumstance is only those cases in which the degree of heinousness, atrociousness, or cruelty exceeds that which will always exist when a capital offense is committed.”
The instruction given in this case was a correct statement of Alabama law. In Norris v. State, 793 So.2d 847 (Ala.Crim. App.1999), this Court discussed the three factors necessary for a finding that a murder was especially heinous, atrocious, or cruel — (1) the infliction on the victim of violence beyond that necessarily or sufficient to cause death; (2) appreciable suffering by the victim after the assault that resulted in the death; and (3) the infliction of psychological torture. In examining the third factor, this Court in Norris stated:
*235 “ ‘[E]vidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel.’ Ex parte Rieber, 668 So.2d 999, 1003 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995).
“ ‘[Generally reasoning that the victims were already fearful for their lives when the fatal injuries were inflicted ..., the courts in many cases have held the proof sufficient to establish as a statutory aggravating circumstance that the murder was especially heinous, cruel, depraved, or the like, even though the victim lost consciousness or died from gunshot ... wounds instantly, within a few seconds or minutes, or otherwise without a time lapse deemed significant by the court, and without suffering other physical injury.’
“[Thomas M.] Fleming, [Sufficiency of Evidence, for Purposes of Death Penalty, to Establish Statutory Aggravating Circumstance that Murder was Heinous, Cruel, Depraved, or the Like— Post Gregg Cases, 63 A.L.R.4th 478 (1988) ] at § 2[a], at 489-90.”
793 So.2d at 860. Immediately following the quote from the article cited in the quote above, the text of this article continues: “Similarly, although the victims lost consciousness or died almost immediately from blows to the head, the courts in several cases have held that the murders were especially heinous, cruel, depraved, or the like, due to the number and severity of the blows....”
The Connecticut Supreme Court in State v. Rizzo, 303 Conn. 71, 31 A.3d 1094 (2011), stated, when considering a similar claim:
“The defendant argues ... that the evidence did not establish the heinousness, cruelty and depravity of his acts in murdering the victim because the attack was unanticipated, the victim’s death likely was swift and, accordingly, the victim simply did not suffer enough either physically or psychologically. We are not persuaded. Courts frequently have concluded that aggravating circumstances similar to Connecticut’s cruel, heinous and depraved factor were sufficiently proven in cases in which a victim was killed by beating or bludgeoning, even when the attack is not especially prolonged and the victim’s loss of consciousness and death occur rather quickly.”
303 Conn, at 153-54, 31 A.3d at 1145-46.
Boyle failed to object to the circuit court’s instructions on this aggravating circumstance. Thus,
“[i]n setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380 (1990), for the proposition that ‘an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.’ Williams v. State, 710 So.2d 1276, 1306 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).”
Pilley v. State, 789 So.2d 870, 882-83 (Ala. Crim.App.1998). There is no “reasonable likelihood” that the jurors applied the instruction in an improper manner. Accordingly, we find no plain error in regard to the court’s instruction on the heinous, atrocious, or cruel aggravating circumstance.
Moreover, if any error did occur in regard to the jury instruction on the especially heinous, atrocious, or cruel aggravating circumstance, the error was harmless beyond a reasonable doubt. This Court in *236 Lawhorn v. State, 581 So.2d 1159 (Ala. Crim.App.1990), stated the following when determining whether a jury instruction is harmless in the penalty phase of a capital-murder trial:
“To determine whether the trial court’s failure to instruct properly was harmless error, the Clemons [v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) ] Court suggests one of two inquiries: (1) whether beyond reasonable doubt the sentence would have been the same had the ‘especially heinous’ circumstance not been considered hy the jury at all, or (2) whether beyond reasonable doubt the result would have been the same had the circumstance been properly defined in the jury instructions. See also Henry v. Wainwright, 721 F.2d 990, 995 (5th Cir. 1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984) (wherein the court, in holding harmless the trial court’s failure to instruct that aggravating circumstances must be found beyond a reasonable doubt, stated that ‘[f]or the failure to give the instruction to be harmless, the evidence must be so overwhelming that the omission beyond a reasonable doubt did not contribute to the verdict’).
“For purposes of our review of this case, we employ the second Clemons inquiry. There is no question, at all, that, had the jury been properly instructed, it would still have returned a recommendation of death because the facts presented to the jury established, beyond any doubt, that this crime was especially heinous, atrocious, or cruel when compared to other capital offenses. The evidence of this circumstance is overwhelming; the facts so conclusively establish it, that no rational jury, properly instructed, could have found otherwise. The evidence is unconflicting that appellant directly participated in a conscienceless, pitiless, and torturous murder. Berry’s last minutes were obviously filled with terror, fear, and knowledge that his death was imminent, and he experienced a high degree of prolonged pain before his death. All of this was accomplished by appellant with complete indifference — complete indifference to Berry’s pain and terror and complete indifference to the value of human life, which he found to be worth $ 50. Clearly, this evidence sets this crime apart, for the degree of heinousness, atrociousness, and cruelty of this offense exceeds that which would be common to all capital offenses. By any standard acceptable to civilized society, this crime was outrageously wicked and shockingly evil. In fact, appellant admitted, during the sentencing phase, that as the victim lay entangled in the underbrush and unable to talk, but gurgling, he repeatedly shot the victim and, at the time, did not care whether the victim died or not.
“We note that this situation does not involve the jury’s consideration of misleading, inaccurate, or illegal information or evidence. Rather, it is a case where the aggravating circumstance, overwhelmingly supported by admissible evidence, was rendered invalid because it was unconstitutionally presented to the jury. We find that the jury’s improper consideration of this aggravating circumstance and possibly improper consideration by the trial court did not render appellant’s sentencing fundamentally unfair. It is unnecessary to vacate appellant’s sentence because we are convinced beyond a reasonable doubt that, had the circumstances been properly narrowed, the jury would have recommended the same sentence and the trial court would have imposed the same sentence. We hold this, even in the face of our recognition of the utmost impor- *237 tanee of insuring that a death sentence not be based on arbitrary and capricious action. While we, in theory, would be very hesitant to find harmless error in the submission to the jury of an unconstitutionally defined aggravating circumstance, we find that the facts of this case support such an application beyond a reasonable doubt.”
581 So.2d at 1176-77.
As the Florida Supreme Court stated in Jennings v. State, 782 So.2d 853 (Fla.2001):
“With respect to the HAC [heinous, atrocious, or cruel] instruction, this Court has found that a constitutionally vague HAC instruction may be found harmless where the facts of the murder support finding the aggravator beyond a reasonable doubt. See Doyle v. Singletary, 655 So.2d 1120, 1121 (Fla.1995) (explaining that error concerning constitutionally vague HAC instruction was subject to harmless error analysis under State v. DiGuilio, 491 So.2d 1129 (Fla. 1986)); Johnston v. Singletary, 640 So.2d 1102, 1104-05 (Fla.1994) (explaining that the ‘jury would have found Johnston’s brutal stabbing and strangulation of the eighty-four-year-old victim, who undoubtedly suffered great terror and pain before she died, heinous, atrocious, or cruel, even with the limiting instruction’); but see Hitchcock v. State, 614 So.2d 483, 484 (Fla.1993) (vacating sentence based on unconstitutional HAC instructional error without conducting a harmless error analysis, on facts similar to those in the instant case). Here, the constitutionally vague pre-Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), HAC instruction constitutes harmless error.”
782 So.2d at 862-63.
Dr. Lauridson testified concerning the numerous injuries that had been inflicted on Savannah, injuries, he said, that spanned the entire circumference of her head. He said that the injuries would have caused her pain. H.D. testified that Savannah threw up, a symptom, Dr. Lau-ridson said, that was consistent with head trauma. The murder was especially heinous, atrocious, or cruel when compared to other capital murders. Accordingly, if any error did occur in the jury instructions, the error was harmless beyond a reasonable doubt.
B.
Boyle next argues that the circuit court erred in refusing to instruct the jury that the age of the victim was not an aggravating circumstance.
At the charge conference, the State objected to Boyle’s proposed instruction that the age of the victim was not an aggravating circumstance. It asserted that it was not an accurate statement of the law because the age of the victim could be considered when determining whether the murder was especially heinous, atrocious, or cruel. (R. 2318.) After a lengthy discussion, the circuit court denied Boyle’s request to charge .the jury on the victim’s age. (R. 2326.) At the conclusion of the court’s instructions, Boyle did not object to the court’s failure to give this instruction.
The court instructed the jury on the aggravating circumstance that it could consider. There is no requirement that the circuit court instruct the jury on all the evidence that is not aggravating. See People v. Rogers, 39 Cal.4th 826, 897, 48 Cal. Rptr.3d 1, 63, 141 P.3d 135, 187 (2006) (“The trial court also need not instruct that the absence of a mitigating factor is not aggravating.”); Edwards v. State, 737 So.2d 275 (Miss.1999) (instruction that capital murder was not an aggravating circumstance was cumulative and repetitious *238 because the court had instructed the jury what aggravating circumstances could be considered).
The circuit court committed no error in declining to instruct the jury that the age of the victim was not an aggravating circumstance.
C.
Boyle next argues that the circuit court erred in refusing to give examples of non-statutory mitigating evidence in its instructions to the jury.
At the charge conference, Boyle requested that the circuit court list examples of nonstatutory mitigating evidence when giving its instructions to the jury. (R. 2626.) The circuit court said that it would instruct the jury that anything could be considered as nonstatutory mitigation but that it would not give examples of such evidence. (R. 2627.)
“ ‘This Court has held that the trial court does not have to instruct the jury from a list of specific nonstatutory mitigating circumstances provided by the defendant.’ Brown v. State, 686 So.2d 385, 403 (Ala. Crim.App.1995), affirmed, 686 So.2d 409 (Ala.1996), cert. denied, Brown v. Alabama, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997). See also Albarran v. State, [96 So.3d 131] (Ala.Crim.App.2011); James v. State, 61 So.3d 357 (Ala.Crim.App.2010).”
Whatley v. State, 146 So.3d 437, 494 (Ala. Crim.App.2010). Courts in other states have reached this same conclusion. See Gillett v. State, 56 So.3d 469, 511 (Miss. 2010) (“This Court has held that ‘[s]pecific instructions on non-statutory circumstances need not be given, so long as a “catch-all” instruction is included that instructs the jury that they may consider any factors that they may deem mitigating in th[eir] deliberations.’ ”); Belcher v. State, 851 So.2d 678, 685 (Fla.2003) (“We find that the trial court did not abuse its discretion by giving a ‘catch-all’ jury instruction about mitigation instead of giving [the defendant’s] list of nonstatutory mitigators.”); Henry v. State, 265 Ga. 732, 741, 462 S.E.2d 737, 746 (1995) (“[The appellant] contends that the trial court erred by refusing to charge the jury in the sentencing phase of the trial on specific examples of mitigation. The trial court was not required to illustrate possible mitigating circumstances for the jury.”).
The circuit court instructed the jury that anything could be considered in mitigation — this was all the court was required to do. There is no requirement that the court give examples of mitigation evidence when giving its charge to the jury in the penalty phase. Accordingly, we find no error in regard to this claim.
D.
Boyle next argues that the circuit court erred in failing to instruct the jury that the finding of a mitigating circumstance did not have to be unanimous before it could be considered as mitigation.
Boyle did not request this instruction nor did he object at the conclusion of the instructions when the court failed to give this instruction. Thus, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
The circuit court gave the following instruction on mitigation evidence, in pertinent part:
“The defendant is allowed to offer any evidence in mitigation; that is, evidence that indicates or tends to indicate that the defendant should be sentenced to life imprisonment without the eligibility for parole instead of death.
“The defendant does not bear a burden of proof in this regard. All the *239 defendant must do is simply present the evidence.
[[Image here]]
“The laws of this state further provide that mitigating circumstances shall not be limited to those I just listed, but shall also include any aspect of the defendant’s character or background, any circumstances surrounding the offense, and any other relevant mitigating evidence that the defendant offers as support for a sentence of life imprisonment without parole instead of death.
[[Image here]]
“Your determination concerning the existence of mitigating circumstances should not, however, be influenced by passion, prejudice or other arbitrary factors. Your determination should be based solely on evidence presented and the laws as I have explained to you.
“The weight each of you give to any particular mitigating circumstance is a matter solely for your individual discretion and judgement.”
(R. 2685-87.) The court further instructed the jury that in regard to the aggravating circumstance the jury had to unanimously find it to exist beyond a reasonable doubt. (R. 2687.) The circuit court’s instructions on mitigating circumstances were substantially similar to the instructions contained in the Pattern Jury Instructions for Use in Capital Cases.
“Here, nothing in the instructions implied that the jury’s findings on mitigation had to be unanimous. In fact, the court instructed the jury that ‘[i]f you are personally persuaded that a mitigating factor exists then you may consider that factor while weighing the evidence.’ Accordingly, this Court holds that no error, much less plain error, resulted from the court’s instructions. See Williams [v. State ], 710 So.2d [1276] at 1307 [ (Ala.Crim.App.1996) ].”
Albarran v. State, 96 So.3d 131, 212 (Ala. Crim.App.2011).
Here, nothing in the instructions implied that the jury’s findings on mitigation had to unanimous. To the contrary, the instructions clearly stated that the findings as to mitigation were to be individual determinations. The circuit court’s instructions on mitigating circumstances did not constitute error, and certainly not plain error.
XXVI.
Boyle next argues that the cumulative effect of the errors that occurred at his trial warrant that he be given a new trial.
“ ‘[W]hile, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, [Ala. R.App. P.,] if the accumulated errors have “probably injuriously affected substantial rights of the parties,” then the cumulative effect of the errors may require reversal.’ Ex parte Woods, 789 So.2d 941, 942 n. 1 (Ala.2001) (quoting Rule 45, Ala. R.App. P.).”
Brownfield v. State, 44 So.3d 1, 33 (Ala. Crim.App.2007).
Applying this standard to the issues in this case, we find that Boyle’s substantial rights have not been injuriously affected; therefore, we find no cumulative error.
Sentencing-Order Issues XXVII.
Boyle argues that the court’s order failed to make specific findings of fact concerning all the aggravating circumstances enumerated in § 13A-5-47, Ala.Code 1975, and all the statutory mitigating circumstances in § 13A-5-49, Ala.Code 1975. Specifically, Boyle asserts that this case *240 should be remanded for correction of the omissions in the sentencing order.
The record shows that the circuit court addressed the only aggravating circumstance that had been presented by the State — that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. In regard to the statutory mitigating circumstances, the circuit court stated:
“The Court, in determining and weighing mitigating circumstances in this case, reviewed all statutory mitigating circumstances, and finds the following statutory mitigating circumstances exist: (1) The age of [Boyle] at the time of the crime as set out in Section 13A-5-51(7), Code of Alabama <1975); and (2) [that Boyle] has no significant history of prior criminal activity, as set out in Section 13A-5-51(l) Code of Alabama (1975).
[[Image here]]
“The Court finds no evidence that [Boyle] was acting under the influence of extreme mental or emotional disturbance or that he lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. The Court further finds no evidence that the victim participated in [Boyle’s] conduct or consented to it. The Court finds no evidence that [Boyle] acted under duress or under the substantial domination of another person.”
(C.R.167-68.)
In Stewart v. State, 730 So.2d 1203 (Ala. Crim.App.1996), this Court addressed the validity of a circuit court’s order that failed to make specific written findings regarding all the applicable aggravating circumstances set out in § 13A-5-49, Ala.Code 1975. In finding the omission harmless, we stated:
“[T]he trial court did not ‘enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49’ as required by § 13A-5-47, Ala.Code 1975. Nevertheless, we find this omission to be harmless.
“ ‘While the trial court’s sentencing order is defective, the errors are not so egregious or substantial as to require a new sentencing order. “The sole purpose of requiring that the trial judge, as the sentencing authority, make a written finding of the aggravating circumstance is to provide for appellate review of the sentence of death.” Ex parte Kyzer, 399 So.2d 330, 338 (Ala.1981). “[T]he harmless error rule does apply in capital cases at the sentence hearing.” Ex parte Whisenhant, 482 So.2d 1241, 1244 (Ala.1983). “As long as the trial judge properly exercises his discretion and the facts indicating the death penalty are ‘so clear and convincing that virtually no reasonable person could differ,’ a harmless error analysis can be used.” Baldwin v. State, 456 So.2d 117, 126 (Ala.Cr.App.1983), affirmed, Ex parte Baldwin, 456 So.2d 129, 140 (Ala.1984). See also Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983); Thompson v. State, 503 So.2d 871, 881 (Ala.Cr.App. 1986), affirmed, Ex parte Thompson, 503 So.2d 887 (Ala.), cert. denied, Thompson v. Alabama, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987). We emphasize that “the safer practice would have been for the trial judge to simply follow the verbiage of the statute in negating aggravating circumstances.” Berard v. State, 402 So.2d 1044, 1051 (Ala.Cr.App.1980).’
“Fortenberry v. State, 545 So.2d 129, 144 (Ala.Cr.App.1988).
“There is nothing to indicate that the trial court refused or failed to consider *241 any aggravating circumstances. Furthermore, this court has before it a sufficient basis for reviewing the appellant’s death sentence. Slaton v. State, 680 So.2d 879 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997); Fortenberry, supra; Kyzer, supra. Therefore, the appellant’s argument is without merit.”
730 So.2d at 1219.
This Court has also found' that a court’s failure to make specific findings of fact concerning two statutory mitigating circumstances did not constitute plain error and did not require that the case be remanded for a new sentencing order. In Beckworth v. State, 946 So.2d 490 (Ala. Crim.App.2005), we stated:
“In a recent case presenting similar circumstances, we held that, although technically deficient, the sentencing order did not require a remand. Pilley v. State, 930 So.2d 550 (Ala.Crim.App. 2005). The trial court in Pilley failed to mention two statutory mitigating circumstances. Although this Court determined that a remand was not possible because the circuit judge who tried the case was no longer on the bench, we further stated:
“ ‘Given these unique circumstances, we do not find it to be in the interests of judicial economy to remand this case for a new sentencing order, in light of the fact that the trial judge found the existence of no mitigating circumstances at Pilley’s first trial and because Pilley presented no evidence in support of any of the statutory mitigating circumstances enumerated in § 13A-5-51, Ala.Code 1975. Moreover, given that no evidence in the record supports the existence of the two mitigating circumstances the circuit court failed to address, we find the court’s omission of these two mitigating circumstances to be harmless.’
“930 So.2d at 569.
“In this case, although the trial judge has not retired from the bench, we find the trial court’s technical defect in failing to mention the § 13A-5-51(l) mitigating circumstance constitutes harmless error and does not rise to the level of plain error requiring a remand. Plain error is error that ‘has or probably has adversely affected the substantial right of the appellant.’ Rule 45A, Ala. R.App. P. Because the trial court considered all of the proffered mitigation, because it found as an aggravating circumstance that Beckworth was under a sentence of imprisonment when he committed this crime, and because there was no support in the record for this mitigating circumstance, it cannot reasonably be argued that the trial court’s failure to state that it did not find this mitigating circumstance to exist has or probably has adversely affected his substantial rights. While we do not wish to be understood as condoning a trial court’s failure to comply strictly with the requirements of § 13A-5-47, Ala.Code 1975, we hold here that the failure to do so does not rise to the level of plain error.”
946 So.2d at 534.
While technically deficient in that the court’s sentencing order failed to address the application of the statutory mitigating circumstance contained in § 13A-5-51(4), Ala.Code 1975, we find that the omission was harmless. One mitigating circumstance is that “[t]he defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor.” § 13A-5-51(4), Ala.Code 1975. There was no evidence presented at trial indicating that Boyle was an accomplice or that his participation was minor. Accordingly, we find *242 that the omissions in the sentencing order were harmless and did not rise to the level of plain error.
XXVIII.
Boyle next argues that the aggravating circumstance that the murder was especially heinous, atrocious, or cruel when compared to other capital offenses, § 13A-5-49(8), Ala.Code 1975, was erroneously applied in this case. He makes two different arguments in support of this contention.
A.
First, Boyle asserts that there was not sufficient evidence to apply this aggravating circumstance. Specifically, he argues that there was not sufficient evidence to satisfy the requirements for this aggravating circumstance set out in Norris v. State, 793 So.2d 847 (Ala.Crim.App.1999).
In regard to this aggravating circumstance, the circuit court stated:
“The jury voted unanimously (12-0) that the State had proven beyond a reasonable doubt that the capital offense was especially heinous, atrocious or cruel compared to other capital offenses, in accordance with § 13A-5-49(8), Code of Alabama (1975). This Court has carefully reviewed all of the relevant evidence submitted for consideration in the sentencing phase of the trial, and has similarly concluded that the evidence supports the jury’s determination beyond a reasonable doubt that the capital offense in the case at bar was in fact especially heinous, atrocious or cruel compared to other capital offenses and so finds. Specifically, the testimony in the case proved that the 2 year old victim in the case was terrified of [Boyle] during the weeks leading up to her brutal murder at the hands of [Boyle], and that testimony to this effect is corroborated by the videotape of the child’s birthday party which occurred two days before she suffered the fatal injury. The evidence supports the conclusion that [Boyle] physically abused the victim for at least a week prior to the fatal injury, and that the abuse included holding a lit cigarette to various parts of the child’s body and burning her. The physical abuse included forcefully striking the child’s head against a car door on- at least one occasion, forcefully striking her head against the bathtub on at least one occasion, and striking her head with his open hand on more than one occasion. It is very clear that the pattern of physical abuse caused the victim to suffer great and intense physical pain, as attested by forensic pathologist Dr. James Lauridson, but also caused this child to suffer psychological anguish and torture. It is apparent from the evidence that she lived in fear of [Boyle], powerless to stop his assaults and unable to remove herself from his presence. [Boyle’s] actions in the brutal murder of this helpless child clearly fit within the parameters of the aggravating circumstance found by the jury to exist in this case.”
(C.R.166-67.)
This Court has stated the following concerning the application of this aggravating circumstance:
“The especially heinous, atrocious, or cruel aggravating circumstance ‘applies] to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.’ Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), citing State v. Dixon, 283 So.2d 1 (Fla.1973).
“ ‘ “There are three factors generally recognized as indicating that a capital offense is especially heinous, atrocious, or cruel: (1) the infliction on the victim of physical violence beyond that *243 necessary or sufficient to cause death; (2) appreciable suffering by the victim after the assault that ultimately resulted in death; and (3) the infliction of psychological torture on the victim.” ’
“Saunders [v. State], 10 So.Sd [53] at 108 [ (Ala.Crim.App.2007) ] (quoting Brooks [v. State ], 973 So.2d [380] at 417-18 [ (Ala.Crim.App.2007) ], citing in turn Norris v. State, 793 So.2d 847 (Ala. Crim.App.1999)).”
Stanley v. State, 143 So.3d 230, 312 (Ala. Crim.App.2011).
“Alabama appellate courts have repeatedly held that severe beatings that result in death are beyond the violence necessary to inflict death; therefore, that manner of homicide is especially heinous, or cruel as compared to other capital murders.” McGowan v. State, 990 So.2d 931, 1004 (Ala.Crim.App.2003). See also Blackmon v. State, 7 So.3d 397, 421 (Ala.Crim. App.2005).
Other states have also held that beatings that result in death are especially heinous murders.
“Courts frequently have concluded that aggravating circumstances similar to Connecticut’s cruel, heinous and depraved factor were sufficiently proven in cases in which a victim was killed by beating or bludgeoning, even when the attack is not especially prolonged and the victim’s loss of consciousness and death occur rather quickly. See, e.g., State v. Colon, supra, 272 Conn. [106,] at 337-38, 864 A.2d 666 [(2004)] (defendant repeatedly slammed two year old victim’s head into shower wall); see also United States v. Agofsky, 458 F.3d 369, 374-75 (5th Cir.2006) (defendant stomped fellow inmate’s head and neck into concrete floor approximately eleven times), cert. denied, 549 U.S. 1182, 127 S.Ct. 1149, 166 L.Ed.2d 998 (2007); United States v. Battle, 264 F.Supp.2d 1088, 1199-1200 (N.D.Ga.2003) (defendant struck victim in head three times with hammer); McGowan v. State, 990 So.2d 931 (Ala.Crim.App.2005) (defendant bludgeoned elderly couple -with hammer), cert. denied, 555 U.S. 861, 129 S.Ct. 136, 172 L.Ed.2d 104 (2008); State v. Kites, 222 Ariz. 25, 30, 39, 213 P.3d 174 (2009) (defendant beat female victim with tire jack), cert. denied, 560 U.S. 907, 130 S.Ct. 3274, 176 L.Ed.2d 1188 (2010); Roberts v. State, 510 So.2d 885, 894 (Fla.1987) (defendant killed victim by numerous blows to back of head with baseball bat), cert. denied, 485 U.S. 943, 108 S.Ct. 1123, 99 L.Ed.2d 284 (1988); Atkins v. State, 497 So.2d 1200, 1202 (Fla.1986) (defendant beat six year old child in head and neck with steel rod); Salvatore v. State, 366 So.2d 745, 747 (Fla.1978) (defendant bludgeoned victim in head and face with pipe), cert. denied, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979); State v. Brooks, 960 S.W.2d 479, 486, 496 (Mo.1997) (defendant beat child victim in head with bed slat), cert. denied, 524 U.S. 957, 118 S.Ct. 2379, 141 L.Ed.2d 746 (1998); State v. Barden, 356 N.C. 316, 371-72, 572 S.E.2d 108 (2002) (defendant beat victim in head fourteen times with small sledgehammer and other weapon), cert. denied, 538 U.S. 1040, 123 S.Ct. 2087, 155 L.Ed.2d 1074 (2003); Willingham v. State, 947 P.2d 1074, 1085 (Okla.Crim.App.1997) (defendant punched and kicked female victim in face and slammed her head into wall). In such cases, given the extremely violent and brutal nature of the defendant’s chosen method of killing, relatively brief periods of intense physical and psychological suffering generally are sufficient to establish the gratuitous cruelty contemplated by the statutory aggravator.”
*244 State v. Rizzo, 308 Conn. 71, 153-54, 31 A.3d 1094, 1146 (2011).
Dr. Lauridson testified that Savannah had injuries around the entire circumference of her head. The injuries, he said, could not have occurred from a single blow but must have occurred from repeated blows. The new blows to her head, Dr. Lauridson said, would have caused her great pain. Dr. Lauridson said that the cigarette burn was not consistent with an accidental burn but was consistent with the cigarette having been held on the child’s body for a period. We agree with the circuit court that the murder was especially heinous, atrocious, or cruel as compared to other capital murders.
B.
Boyle next argues that the especially heinous, atrocious, or cruel aggravating circumstance, § 13A-5-49(8), Ala.Code 1975, is unconstitutionally vague.
For the reasons stated in Minor v. State, 914 So.2d 372 (Ala.Crim.App.2004), this issue has no merit:
“With respect to Minor’s constitutional challenge to the heinous, atrocious, or cruel aggravating circumstance -in § 13A-5-49(8), Ala. Code 1975 [that it is unconstitutionally vague and overbroad] this Court has repeatedly upheld that circumstance against similar challenges. See Duke v. State, 889 So.2d 1 (Ala. Crim.App.2002); Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999), aff'd, 779 So.2d 1283 (Ala.2000); Freeman v. State, 776 So.2d 160 (Ala.Crim.App. 1999), aff'd, 776 So.2d 203 (Ala.2000); Bui v. State, 551 So.2d 1094 (Ala.Crim. App.1988), aff'd, 551 So.2d 1125 (Ala. 1989), judgment vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991); and Hallford v. State, 548 So.2d 526 (Ala.Crim.App. 1988), aff'd, 548 So.2d 547 (Ala.1989).”
914 So.2d at 437.
XXIX.
Boyle next argues that a defect in the circuit court’s sentencing order shows that the court required that the mitigating circumstances outweigh the aggravating circumstances. Specifically, the circuit court’s order states, in part: “The Court further finds that the statutory and nonstatutory mitigating circumstances presented in this cause are insufficient to outweigh the aggravating circumstances in this case.” (C.R.168.)
In addressing an identical statement in a circuit court’s sentencing order, the Alabama Supreme Court, finding the error harmless, stated:
“The trial judge sentenced the defendant to death upon a finding ‘that the mitigating circumstances heretofore enumerated are insufficient to outweigh the aggravating circumstance.’ [Melson v. State,] 775 So.2d [857] at 901 [ (Ala. 2000) ]. To support the imposition of the death penalty, the law requires that the aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances. See § 13A-5-47(d) and (e), Ala.Code 1975; Ex parte Jones, 456 So.2d 380, 382 (Ala.1984).
“On this point, the Court of Criminal Appeals cited Weaver v. State, 678 So.2d 260 (Ala.Crim.App.1995), rev’d on other grounds, 678 So.2d 284 (Ala.1996), and other cases for the proposition that this defect was a ‘technical’ defect or error, and correctly concluded that the error was harmless in this particular case, but the error should not be minimized as a mere technicality. A trial court is to impose a sentence of death only after finding that the aggravating circumstance or circumstances outweigh the *245 mitigating circumstance or circumstances. But we conclude in this case, as did the Court of Criminal Appeals, that the ‘error in the trial court’s sentencing order was error without injury.’ See 775 So.2d at 902. Certainly, the better practice would be to strictly follow the mandates of the statute when imposing death sentences.”
Ex parte Melson, 775 So.2d 904, 907 (Ala. 2000). See also Reynolds v. State, 114 So.3d 61 (Ala.Crim.App.2010).
Here, the court instructed the jury, several times, that before the jury could vote for the death penalty the aggravating circumstance must outweigh the mitigating circumstances and that the weighing process was not a numerical tallying. (R. 2676; 2696-97.) It is clear that the circuit court was aware of the appropriate legal, standard to apply when determining Boyle’s sentence. For these reasons, we find that the error in the sentencing order was error without injury.
XXX.
Last, in accordance with § 13A-5-53, Ala.Code, 1975, this Court must address the propriety of Boyle’s capital-murder conviction and sentence of death.
Boyle was convicted of murdering 2-year-old Savannah, an offense defined as capital by § 13A-5-40(a)(15), Ala.Code 1975, because Savannah was under the age of 14 at the time of her death. Our review of the record shows that Boyle’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala.Code 1975.
The circuit court found the existence of one aggravating circumstance — that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. See § 13A-5-49(8), Ala.Code 1975. The court found the existence of two statutory mitigating circumstances: (1) That Boyle had no significant history of prior criminal activity, § 13A-5-51(l), Ala.Code 1975; and (2) Boyle’s age at the time of the murder, § 13A-5-51(7), Ala.Code 1975. Boyle was 21 years old at the time of the murder. In regard to nonstatutory mitigating evidence, the court found:
“The Court has considered all of the evidence presented by [Boyle] during the sentencing phase of the trial, including testimony from his sister and former coach, and their love and concern for him. The Court has also considered and carefully weighed the testimony of [Boyle’s] mitigation expert, Dr. Allen Shealy. The Court notes that there was evidence of serious abuse and neglect of [Boyle] as a child, a significant absence of parental stability and nurturance (an absent father and a mother who suffered from addictions and psychiatric problems), the absence of a stable home environment and a history of polysubstance abuse, emotional immaturity and depression. The Court notes that [Boyle’s] sister and extended family and friends loved [Boyle], that they felt the love that [Boyle] had for them, that they believe that he has good and admirable qualities, and that they urge this Court to spare [Boyle’s] life so that he will have an opportunity to continue to be loved, valued member of their friendship or family circles. The Court further finds and considers as mitigating evidence in [Boyle’s] behalf all relevant evidence of [Boyle’s] life, background, family and education history, and accords it the weight to which it is due.”
(C.R.167.) The circuit court determined that the sole aggravating circumstance outweighed the mitigating circumstances.
*246 After independently weighing the aggravating circumstance and the mitigating circumstances, this Court is convinced, as was the circuit court, that death is the appropriate punishment for the murder of two-year-old Savannah. See § 13A-5-53(b)(2), Ala.Code 1975.
Neither is Boyle’s sentence of death disproportionate or excessive to penalties imposed in similar cases. See Blackmon v. State, 7 So.3d 397 (Ala.Crim.App. 2005); Minor v. State, 914 So.2d 372 (Ala. Crim.App.2004); McGowan v. State, 990 So.2d 931 (Ala.Crim.App.2003).
Last, as required by Rule 45A, Ala. R.App. P., this Court has searched the record for any error that may have affected Boyle’s substantial rights and have found none.
For the foregoing reasons, we affirm Boyle’s capital-murder conviction and his conviction for possession of a controlled substance.
AFFIRMED.
WINDOM, P.J., and WELCH, KELLUM, and JOINER, JJ., concur.

. At the time of Boyle’s trial the victim's sister had been adopted. To protect the anonymity of this child witness we are using her initials.

. On cross-examination, H.D. said that these events happened two nights before Savannah's death.

. To protect the anonymity of the jurors we are using their initials.

. Millican was properly allowed to testify as to what Boyle told her. See Rule 801(d)(2), Ala. R. Evid. Rule 801(d)(2) provides that a statement is not hearsay if it is "offered against a party and is (A)... the party’s own statement in either an individual or a representative capacity.” The statement was an admission against a party-opponent.

. Rule 512(b), Ala. R. Evid., states: "In jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury.”